[Civ. No. 47132. Second Dist., Div. Three. Mar. 9, 1977.]

SPECIALTY RESTAURANTS CORPORATION,
Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

PSA HOTELS, INC., Plaintiff and Respondent, v.
CITY OF LONG BEACH et al., Defendants and Appellants.

**COUNSEL**

John H. Larson, County Counsel, and Dixon M. Holston, Deputy County Counsel, for Defendants and Appellants.

Ball, Hunt, Hart, Brown & Baerwitz, Clark Heggeness, Dietsch, Gates, Morris & Merrell and Roger C. Wesley for Plaintiffs and Respondents.

**OPINION**

**FORD, P. J.**—Plaintiffs Specialty Restaurants Corporation and PSA Hotels, Inc., are lessees of premises on the *Queen Mary,* a stationary

vessel owned by the City of Long Beach, California. In 1973, 1974 and 1975 the Assessor of the County of Los Angeles assessed the leasehold interests of plaintiffs on the theory that those interests were possessory interests in real property or in improvements to real property.

On or about September 1, 1972, each of the plaintiffs paid the taxes levied and assessed for the 1972-1973 tax year upon its possessory interests in the *Queen Mary* under protest and filed an application with the assessment appeals board contending that the *Queen Mary* was personal property and that plaintiffs' possessory interests in the *Queen Mary* were possessory interests in personal property and, as such, not subject to taxation.

The assessment appeals board (hereinafter referred to as the Board) conducted hearings during which evidence was received. Pursuant to the stipulation of the parties, the Board conducted a view of the *Queen Mary* and the surrounding area. The Board made findings of fact to the effect that the *Queen Mary* was personal property and that the possessory interests of plaintiffs in the *Queen Mary* were possessory interests in personalty and not possessory interests in real property or in improvements to real property.

Thereafter plaintiffs filed verified claims with the Board of Supervisors of Los Angeles County for refunds of taxes assessed and paid for the 1972-1973 tax year. Plaintiffs' claims were denied by operation of law. Plaintiffs each filed a complaint in the superior court for recovery of taxes paid under protest. Pursuant to stipulation of the parties the two cases were consolidated for all purposes.

Under the governing law the primary issue presented to the superior court for resolution was whether the plaintiffs' possessory interests were taxable. In *Pacific Grove-Asilomar Operating Corp.* v. *County of Monterey*, 43 Cal.App.3d 675, at page 681 [117 Cal.Rptr. 874], the court stated: "Respondent's action below was an action to recover taxes erroneously and illegally collected, and not an action pursuant to section 1094.5 of the Code of Civil Procedure. An action may be brought against a county or city to recover property taxes paid by a taxpayer under protest. (Rev. & Tax. Code, § 5138.) [¶] If the action merely questions the propriety of the board of equalization's refusal to correct an erroneous assessment, the court cannot try de novo the question of any alleged overvaluation, but is limited to a consideration of the proceedings before the board.

[Citations.] Where the action involves a question of legality or constitutionality of the assessment and not a question of valuation, the court can try de novo the question presented to it. [Citations.]"

When the actions came before the superior court for trial, it was stipulated that the matter would be submitted on the record of the proceedings before the Board and a view of the *Queen Mary* by the trial judge. The trial court found that the Board had "jurisdiction and the power to conduct the hearings" and "to change the classification of the possessory interest in, on and to the *Queen Mary* from land or improvements to personal property." The court further found that the findings of the Board "were supported by substantial evidence."

Independently of its findings with respect to the proceedings of the Board, the court found that "the *Queen Mary* at all times was not and is not real property or an improvement; that the *Queen Mary* floats in the ocean and was not and is not affixed, attached or annexed to any land and was not and is not a fixture; that the *Queen Mary* was and is personal property; that the possessory interests of plaintiffs in, on and to the *Queen Mary* were and are possessory interests in personal property; and that said possessory interests are not possessory interests in real property, improvements or fixtures."

Judgment in favor of plaintiffs for the refund of the taxes involved was entered.[1] The defendants City of Long Beach and County of Los Angeles appealed from the judgment.

In view of the present posture of the litigation and the primary question presented for resolution, under the reasoning of *Pacific Grove-Asilomar Operating Corp.* v. *County of Monterey, supra,* 43 Cal.App.3d 675, as set forth hereinabove, it is not necessary to consider specifically the propriety or validity of the proceedings of the Board. (See *Star-Kist Foods, Inc.* v. *Quinn,* 54 Cal.2d 507, 509-511 [6 Cal.Rptr. 545, 354 P.2d 1]; *Parr-Richmond Industrial Corp.* v. *Boyd,* 43 Cal.2d 157, 164-165 [272 P.2d 16].) Consequently, we turn to the determinative issue of whether the plaintiffs' possessory interests with respect to the *Queen*

---

[1]The court proceeded in accordance with the stipulation of the parties that the court should adjudicate the validity of the taxes assessed upon the respective possessory interests of plaintiffs in, on and to the *Queen Mary* for the 1973-1974 and the 1974-1975 tax years, as well as for the 1972-1973 tax year.

*Mary* constitute possessory interests in improvements to real property within the meaning of Revenue and Taxation Code section 107.[2]

On this appeal, the City of Long Beach and the County of Los Angeles contend that there was insufficient evidence to support the trial court's determination as to the nature of plaintiffs' respective possessory interests. As noted hereinabove, the evidence before the trial court was that which had been presented at the hearings before the Board. In addition, pursuant to the stipulation of the parties the court viewed the *Queen Mary* and the surrounding area, as will be more fully discussed hereinafter. The evidence presented at the hearings before the Board on the issue of the classification of the *Queen Mary* included certain documentary evidence, diagrams and photographs, the testimony of Captain James P. Lynch, Director of the *Queen Mary* Department of the City of Long Beach, and that of Donald Davis, senior appraiser in the office of the Los Angeles County Assessor. A summary of that evidence will be set forth.

Captain Lynch testified that the *Queen Mary* is afloat and that the keel of the ship is "from approximately five feet to twelve feet off the bottom," depending on the "state of the tide." The ship moves a maximum of six inches fore and aft and the "same distance out from the wharf" as a result of winds. The *Queen Mary* is located at "its own special wharf at Pier J in Long Beach." The nearest portion of the ship's hull is "[a]pproximately 25, 30 feet" from the wharf. There are "approximately 15 gangways which provide ingress or egress for people in and out of the ship." The gangways are fixed to the hull by metal hangers which are attached to hull fittings that have been welded to the hull. A safety chain is affixed at the hull ends of the gangways. The shore ends of the gangways are on rollers to allow for movement of the ship. All of the connections for the gangways are removable.

All services are external to the ship and, accordingly, there are numerous service lines from the shore to the ship. Captain Lynch testified that there were "fire main connections and sprinkler main connections fore and aft . . . [and] portable [*sic*] water connections fore and aft." The flexible rubber waterlines connect the ship with the city water system and are "flange bolted" at the ship's end and at the wharf's end "with approximately 12 bolts." The waterlines can be disconnected

---

[2]The question of taxability in this case is limited to the plaintiffs' respective possessory interests in the *Queen Mary* and is not concerned with other property such as the wharf and adjacent parking facilities used in conjunction with the *Queen Mary*.

at either end by "unbolting the flange connection." There are two sewage lines running from the ship to the shore which are attached by the same type of "bolted flange connections." At the forward end of the ship "chicksan, flexible" metal lines supply chilled water and steam to the ship for the air conditioning and heating systems. The metal lines are also attached by bolted flange connections; however, because of the weight of the lines, cranes would be necessary to remove them.

There are four electrical conduits between the ship and shore, a telephone cable, and a "many lead conduit" that is part of the ship's "Honeywell Detection Monitoring System" which "monitors the performance of fire pumps which are located on the wharf." There are twelve wire cable mooring lines connecting the ship to the shore; six of the mooring lines are "permanent mooring lines" and they are "supplemented by supplementary lines" which were "added for additional security"; all of the mooring lines can be detached "with the proper equipment and necessary tools." The ship has a "cathaodic protection system" to prevent "electrolytic corrosion" and "protect the integrity of the underwater hull"; as part of the system, 20 "electrical cable leads" are attached to the hull of the ship and run to anodes connected to the ocean floor.

A rock dike has been built around the ship to protect it from water surge, wind, and "excessive silting in the basin." The closest distance between the ship and the dike is "approximately 75 feet." Two of the ship's original four engines have been completely removed. The two remaining engines, located in the "after engine room," form part of an exhibit in "the museum." The ship has no propulsion power; it was towed from its former mooring place to Pier J. The ship could not be safely towed outside the harbor "because of its alterations since it came to Long Beach." The rudder of the ship is welded so that it cannot be operated. All 23 of the ship's boilers have been removed. The ship's fuel tanks are intact but are not used as such; their purpose is to "maintain their [sic] buoyancy and stability of the ship."

Captain Lynch testified that he doubted "very seriously" that the Queen Mary's original propulsion system could be restored. There had initially been some discussion within the Queen Mary Department of the City of Long Beach about securing the Queen Mary to the ocean floor by some method such as "putting the ship in concrete," but the idea was rejected in part because of the fear of earthquake damage.

The mooring lines connecting the *Queen Mary* to the wharf are not similar to those used by an operating ship; the mooring lines used by an operating ship would normally be made of "manila or dacron" because "they are easier to fasten and unfasten"; the mooring lines used on the *Queen Mary* are "permanent from the point of view we don't feel we have to change them." The wharf structure which provides ways onto and off of the *Queen Mary* was designed specifically for the *Queen Mary*. Captain Lynch testified that "[t]he whole site of the ship, of course, was planned on the basis that the *Queen Mary* would be moored there." He further testified that it was "not inconceivable" that the wharf could be adapted to the dimensions of another large ship.

Captain Lynch testified that the City of Long Beach had based its leases and plans on a 50-year life for the *Queen Mary*. With respect to the city's plans for the *Queen Mary*, Captain Lynch further testified as follows: "Q. Captain Lynch, is it the Queen Mary Department's present intention that the Queen Mary remain permanently or at least for the period you just described [50 years] at Pier J.? . . . THE WITNESS: Yes. There is [*sic*] no plans to move the Queen Mary."

Donald Davis, senior appraiser for the Los Angeles County Assessor's office, testified that 32.58 acres of the 59.93 acres of land which constitute the site of the *Queen Mary* project are owned by the Long Beach Harbor Department and are leased by that department to the *Queen Mary* Department of the City of Long Beach. Prior to the execution of that lease the land was unimproved land fill. After the execution of the lease numerous improvements were made with respect to the site. The sum expended for land fill was $1,979,436. The wharf developed for the *Queen Mary* cost $869,495. Surface improvements and beautification, which included "paving, lights, strips, and the landscaping," cost $2,755,749. Utilities cost $735,119. Ship access facilities, including walkways, elevator and escalator units, cost $2,265,511. Surface structures in the ticket booth area cost $11,260 and the rock dike around the ship cost $1,375,401. The amount of $239,045 was spent on the engineering of the site and mooring facilities. The central plant service line from the refrigeration plant to the ship cost $437,017 and special lighting and sign placement cost $82,441. A total amount of $10,750,474 was spent on these improvements to the site to accommodate the *Queen Mary* as a tourist attraction.

An additional total sum of $23,732,035 was expended for structural conversions and refurbishments with respect to the ship itself. The initial

purchase price of the *Queen Mary* was $3,450,000. The cost of delivery was $156,062 and an import duty was paid of $39,696. With additional costs for California use tax, engineering and temporary site preparation, the total cost for acquisition of the ship amounted to $4,700,915.

As part of the *Queen Mary* project the City of Long Beach expended a total of $15,172,624.95 to build roads and bridges for the purpose of providing automobile access to the *Queen Mary* site. The sum of $1,319,758 was expended on dry-docking, "protective work" and miscellaneous costs.

In summary, a total amount of $57,143,416 was spent by the City of Long Beach to acquire the *Queen Mary* and prepare the site to accommodate the *Queen Mary* as a major tourist attraction.

As part of the *Queen Mary* project, the City of Long Beach entered into a contract with Ohio Engineering Systems for construction of an energy plant near the project area to supply the *Queen Mary* with chilled water and steam. In July 1972 the city purchased the plant from Ohio Engineering Systems for $1,535,986.93.

Captain Lynch testified that in order to move the *Queen Mary* from its location at Pier J it would be necessary to remove enough of the rock dike "to permit the ship to safely exit through the opening." Captain Lynch estimated that if the work of removing the rock dike was "done at a normal work pace," the job would constitute "a month's work." The equipment necessary to remove or dismantle the gangways leading to the ship would be "a pair of cranes with a long extension, booms to lift the gangways from the ship down to the water." Captain Lynch estimated that based on a 40-hour week it would take about two weeks to remove the gangways. Cranes and tools sufficient to "break the connections" would be required to remove the utility lines. Captain Lynch was of the opinion that, assuming a 40-hour week and "[n]ormal operation," it would take "one to two weeks" to remove the utility lines. He expressed the further opinion that it would take approximately one to two weeks and require "special equipment" to remove the mooring lines.

The principles applicable to a determination of whether a structure constitutes an improvement to realty or is personalty are well settled. Revenue and Taxation Code section 104 provides that "real estate" or "real property" includes improvements. Revenue and Taxation Code section 105 defines "improvements" as including "[a]ll buildings, struc-

tures, fixtures, and fences erected on or affixed to the land, except telephone and telegraph lines." Civil Code section 660 provides that a "thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws; . . ." Revenue and Taxation Code section 106 provides that " '[p]ersonal property' includes all property except real estate."

In *San Diego T. & S. Bank* v. *San Diego,* 16 Cal.2d 142, the court stated at page 147 [105 P.2d 94, 133 A.L.R. 416]: "It has often been declared judicially, and it is well settled in this state, that the definition of property contained in the provisions relating to taxation in the Political Code [now found in the Revenue and Taxation Code] controls the classification of property for taxation purposes."

■ Defendants contend that plaintiffs' possessory interests in the *Queen Mary* are possessory interests in real property because the *Queen Mary* is an improvement, being either a structure or fixture affixed to the land within the meaning of Revenue and Taxation Code section 105. ■ In *Simms* v. *County of Los Angeles,* 35 Cal.2d 303, at page 309 [217 P.2d 936], the court stated three tests to be applied in determining whether an article is a fixture or an object affixed to the realty: "(1) the manner of its annexation; (2) its adaptability to the use and purpose for which the realty is used; and (3) the intention of the party making the annexation." For taxation purposes the intention which is determinative is not the subjective intention of the party making the annexation, but the intention apparent from the physical facts. Thus in *Simms* v. *County of Los Angeles, supra,* at page 309, it is stated: "It is also settled that for tax purposes the 'intention' must be determined by the physical facts or reasonably manifested outward appearances without regard to the annexor's status as landlord or tenant." (See *San Diego T. & S. Bank* v. *San Diego, supra,* 16 Cal.2d 142, 149; *Southern Cal. Tel. Co.* v. *State Board,* 12 Cal.2d 127, 134 [82 P.2d 422]; *M. P. Moller, Inc.* v. *Wilson,* 8 Cal.2d 31, 37 [63 P.2d 818].)

■ In this case the City of Long Beach's intention to make the *Queen Mary* a permanent addition to the realty is clearly manifested by the physical facts. The *Queen Mary* houses a museum, a hotel, restaurants and various shops. Extensive sums of money were expended

by the city to develop the *Queen Mary* and its site at Pier J as a tourist attraction. A large rock dike encloses the *Queen Mary*. A system has been established to protect the underwater hull of the *Queen Mary* and to eliminate the necessity of moving the ship to a dry dock to maintain its underwater surfaces. An extensive system of utilities has been established to supply the ship with such items as water, steam, sewage disposal, electricity and communication. A power plant was built to service the *Queen Mary* exclusively. An extensive system of gangways reached by means of elevators and escalators was built to allow access to the ship by tourists and other patrons. A large parking facility was established to accommodate visitors and large sums of money were expended on access roads and bridges. A consideration of the physical facts compels the inference that the city intended the *Queen Mary* to be a permanent addition to real property.

As was said in *Trabue Pittman Corp.* v. *County of L.A.*, 29 Cal.2d 385, at page 393 [175 P.2d 512]: "We have already indicated that for the most part assessors must be allowed to act on the basis of outward appearances. Moreover, in distinguishing permanence from transitoriness it is not necessary to identify it with perpetuality. [Citation.] 'It appears to be sufficient that it [the article annexed] is intended to remain where placed as long as the land or building to which it is annexed may be used for the same purpose.' (36 C.J.S., Fixtures, § 2, p. 900.) 'It is sufficient if the article shall appear to be intended to remain where fastened until worn out, until the purpose to which the realty is devoted has been accomplished or until the article is superseded by another article more suitable for the purpose.' [Citations.]"

██    Great expense involved in removal of heavy equipment and the difficulty attending its removal are indicative of intended permanence. (*Southern Cal. Tel. Co.* v. *State Board, supra,* 12 Cal.2d 127, 137; *Bank of America* v. *County of Los Angeles,* 224 Cal.App.2d 108, 113-114 [36 Cal.Rptr. 413, 6 A.L.R.3d 491].) The fact that the evidence showed that with the expenditure of considerable time and effort the *Queen Mary* could be removed from its location at Pier J is not determinative as to its nature for purposes of taxation. Thus, in *San Diego T. & S. Bank* v. *San Diego, supra,* 16 Cal.2d 142, at page 151, the court stated: "The mere fact that said doors can be removed without material damage to the vaults by chipping away with a chisel, jack hammer, or compressed air hammer, the cement grouting which attaches them to the vaults, does not alone establish their character as articles of personalty. A door or window in an ordinary dwelling house can be removed with very little damage to the

realty. It also may be replaced by one of different design or by a new one if the former should become broken or defective, but no one would contend that either was not a part of the realty by reason of these facts alone."

The second test mentioned in *Simms* v. *County of Los Angeles, supra,* 35 Cal.2d 303, is the "adaptability" of the article to the "use and purpose for which the realty is used." "The most favored indicia of implied intention of permanence of annexation, for general purposes, are the various circumstances surrounding the *use* of the property. The question most frequently asked is whether the real property is peculiarly valuable in use because of the continued presence thereon of the annexed property." (Holmes, *Classification of Fixtures for Assessment,* 29 Cal.L. Rev. 21, 29; see 5 Powell on Real Property (1976 ed.) ¶ 660, pp. 96.3-96.4.)

Thus, in *Southern Cal. Tel. Co.* v. *State Board, supra,* 12 Cal.2d 127, the court held that central office equipment of a telephone system consisting of switchboards, cables, relay racks, relays, coils, coil racks, fuse panels, motors, call registers and similar equipment was properly assessed as part of the realty for purposes of taxation because such articles were specially adapted to the purposes for which the buildings in which they were housed were designed. The court stated at page 136 as follows: "The fact that articles affixed are necessary or convenient to the use of a building for the purpose for which it is designed is generally treated as tending to indicate they are realty. [Citations.]"

In *Kaiser Co.* v. *Reid,* 30 Cal.2d 610 [184 P.2d 879], the plaintiff sought a refund of taxes levied upon its possessory interest as a tenant of Richmond Shipyards Nos. 3 and 3-A which plaintiff had paid under protest. The assessment was limited to plaintiff's possessory interest in improvements. The plaintiff contended that "the facilities in Shipyard No. 3-A were personalty and a possessory interest therein was not subject to assessment under California statutes." (30 Cal.2d at pp. 617-618.) With respect to the nature of the facilities, the Supreme Court stated (30 Cal.2d at p. 630): "The facilities in Shipyard No. 3-A, like those in Shipyard No. 3, included property of a substantial nature, such as concrete basins, piping and wiring, corrugated iron buildings, frame buildings, concrete buildings, gates and fences, ways, docks and piers, lean-to sheds and portable buildings, platforms, tracks and runways, utility buildings, machinery and equipment, paving and railroad tracks. Plaintiff did not produce either before the respective boards of equaliza-

tion or the trial court any specific testimony bearing on the nature of this property—its size and manner of attachment to the land—and refuting its classification according to outward appearances and physical consi- derations as 'improvements' to realty. On the contrary, it appears from the evidence before the boards of equalization that one of plaintiff's own witnesses, the executive assistant to its general manager, admitted that all of the equipment included as improvements for tax purposes was 'an integral part of the operation of the' shipyards, thus constituting 'a unit for use together' and giving to it the character of 'improvements to realty' for tax purposes. (*Southern California Telephone Co.* v. *State Board of Equalization,* 12 Cal.2d 127, 138 [82 P.2d 422].)"

In the cases presently before us the fact that the *Queen Mary* is integral to the purpose for which the land is used appears to be beyond question. All the improvements made to the land were designed to accommodate the *Queen Mary* as a tourist attraction. It is manifest that the area of real property permanently occupied by the *Queen Mary* is "peculiarly valuable in use" because of the *Queen Mary's* presence.

Turning to the question of the manner in which the *Queen Mary* has been annexed to the land, it is manifest that the annexation is substantial. We note the various service lines, the steel mooring lines, the extensive gangway structure, each connecting the ship with the wharf in a permanent manner, and the anti-corrosion device linking the hull to the bottom of the basin. The rock dike enclosing the ship clearly blocks its ready removal from the site.

In *Bank of America* v. *County of Los Angeles, supra,* 224 Cal.App.2d 108, the court held that large computer systems housed in specially designed buildings were properly taxed as fixtures. Therein the court stated (224 Cal.App.2d at p. 113): ". . . the size and weight (11 tons to each system) likewise militate against moving, regardless of the method of attachment to the building (in *Bell* v. *Bank of Perris,* 52 Cal.App.2d 66, 76 [125 P.2d 829], the court quoted from Corpus Juris to the effect that ' "Retention in place by gravity, without any fastening, has been not infrequently held to be insufficient, but the later cases usually regard this as sufficient, provided the intention to make the article part of the realty plainly appears and the article or structure is so heavy that it is as effectively kept in place by gravity as if it were fastened." '); . . ." Furthermore, under the doctrine of constructive annexation, "[p]ortions of equipment not attached to the realty but which are used with and essential to other portions attached to the realty constitute a unit and are

constructively annexed [citations]." (*Pajaro Valley Bank* v. *County of Santa Cruz,* 207 Cal.App.2d 621, 627 [24 Cal.Rptr. 639]; see *Southern Cal. Tel. Co.* v. *State Board, supra,* 12 Cal.2d 127, 138.)

In making its finding that the *Queen Mary* was personal property the trial court stressed the fact that "the *Queen Mary* floats in the ocean." However, we do not think that that fact is determinative. The *Queen Mary* is securely fastened to the wharf and its movement is minimal. Captain Lynch testified that the decision to allow the ship to float in its enclosed basin was to protect against possible earthquake damage; that manner of placement in no way indicates an intention on the city's part to make the *Queen Mary* other than a permanent addition to the land.

The uncontradicted testimonial and documentary evidence presented in this matter with respect to the proper classification of the *Queen Mary* for tax purposes clearly fails to support the trial court's determination that the *Queen Mary* is personal property. In the light of such evidence, we turn to the question of what effect should be given to the trial court's view of the *Queen Mary* and the surrounding site under the peculiar circumstances presented.

In *Key* v. *McCabe,* 54 Cal.2d 736, at page 739 [8 Cal.Rptr. 425, 356 P.2d 169], the court stated the general rule as to the significance of a view by the trial judge as follows: "In addition to the above evidence sustaining the findings of the trial court, the trial judge, before making his findings, viewed the premises and property in question. This view constituted substantial evidence in support of the questioned findings, the rule being established that the trier of fact's view of an area is independent evidence which can be considered by him in arriving at his conclusion and is substantial evidence in support of findings consonant therewith. [Citations.]"

In the present case the trial judge stated that upon the stipulation of counsel he would view the *Queen Mary* and that then he would report his view "into the record." Counsel stipulated to the view by the court. After the trial court and counsel had returned from viewing the *Queen Mary,* the trial judge stated as follows: "All right. Let the record show that we, the court with all counsel representing all parties, attended at the *Queen Mary* today. There I requested counsel for the County to point out those areas, which he contends indicate such annexation of the *Queen Mary* . . . in those areas where the *Queen Mary* is so annexed or so

affixed or otherwise incorporated in or to or on the land that it could be properly classified as an improvement; I think it is not. . . . But the question before this Court is whether it is an improvement within the meaning of the . . . Taxation Code and within the meaning of the taxation laws permitting the County to tax possessory interests in land and/or in improvements on land. Now, I also asked Mr. Holston [deputy county counsel] for the benefit of the record to point out—to again recite for the record those areas, which he pointed out to the Court which he deems indicate such annexation, and I am talking about physical annexation, so as to constitute the *Queen Mary,* and [*sic*] improvement, fixture or such part of the land that it is now subject to such tax. . . . I would prefer if you dealt first with physical annexation, those areas; then go into the matter of intent to adapt it or to annex it."

Mr. Holston proceeded to detail the numerous physical facts observed by the court and counsel, which description conformed to the facts as described in the testimony introduced at the hearing before the Board previously outlined in this opinion. Mr. Holston spoke of the approximately 12 mooring cables, noting that the "thick steel cables . . . were attached to the ship by a special attachment, which we were informed was one of the attachments put on after the ship was taken into that position." He stated that there were connections for the cables "at both the ship and the shore." He further stated that "it appeared that the lines could, in fact, be removed, if they had to be removed," but that "[t]he connections and the cables themselves were quite substantial, quite heavy." Mr. Holston noted the various water lines, sewer lines, and steam lines "leading to and from the ship and dock area." He stated that "[t]he chilled water and steam lines, in particular, which led from the dock to the front of the *Queen Mary,* were large in size, apparently rigid, but we were informed, with some sort of connection which would enable them to move to some degree."

Mr. Holston described the "series of gangways" estimating that there were "ten or more." He pointed out the manner in which the gangways were affixed as follows: "The gangways or the pathways were affixed in the manner—usually there was a platform type of connection at the ship side with some sort of rigid support underneath or at least in the one case I should say rigid support underneath. There were connections by which the pathway or gangway could be affixed to the side of the *Queen Mary.* It appeared that this was by way of boats [bolts], which again probably could be removed if it was necessary to move the *Queen Mary.* THE COURT: The land end of the gangways? MR. HOLSTON: And the land end

of the gangways. The gangways rested on the land in an area which was indented down approximately a foot or a foot and a half. The gangways themselves appeared to have or we were informed they had rollers, which enabled them to move to a limited degree. There was a metal covering over what gap might exist between the end of the gangway and the land itself. THE COURT: I think he referred to it as an apron, a metal apron."

Mr. Holston described the structure at the land end of the gangways; it contained the ticket booths, elevators and escalators; it was "arranged in such a way that the gangways, which came from the ship, would rest on various ends of this structure pointed toward the ship so that a person could walk on a covered walkway, get on an escalator, go up to a particular level of the *Queen Mary* that he wished to enter, walk on this structure to the gangway, which came from the ship, . . . and then straight into the *Queen Mary.*"

Mr. Holston mentioned the system "which prevents a corrosion on underside of the *Queen Mary*"; he stated they had been "informed" that that was another factor showing physical annexation.

Mr. Holston also made reference to the rock dike surrounding the *Queen Mary.* The court noted that the rock dike was "not physically attached in any way to the floating Queen."

Mr. Holston further stated as follows: "I should mention also the surface improvements and the landscaping on the land itself, the extensive nature of the development of the parking lot, the service buildings that are in the area, the fencing, the fact that from the structure, which I mention, which connects directly with the *Queen Mary* or affords a connection with the *Queen Mary,* another structure leads from that directly outward in what would be, I guess, a southerly direction on a ninety degree angle from the ship or from the *Queen Mary* to the village area, which is another improvement there on the land, what looks like a small fishing village, English village of some sort. I should mention that would fall, I think, within the category of a ship access facility and of surface improvements and landscaping. Insofar as improvements in the utility nature, I would like to mention . . . the steam, . . . and chilled water plant, which we observed from a distance and which is within a few hundred yards of the *Queen Mary* and which we were informed provides the chilled water and steam for the *Queen Mary.*"

Mr. Holston also spoke of the roads and freeway bridges which had been built to provide "automobile access" to the *Queen Mary*. Bearing further on the intent issue, Mr. Holston mentioned the fact that it appeared in the record that the ship's engines and boilers had been removed. Thereupon the court commented: "I deem the gutting, to use the term, of the *Queen Mary's* gear to have been sufficient to change its character from a vessel capable or a vessel transporting passengers and property to some kind of a dead or deactivated barge or ship in the sense that—and I am using the term 'ship' as something that floats on water but that deactivation of its essential gear, for the purpose of transporting people, doesn't make it any the more land or improvements to land. So it doesn't enter into substantial consideration, except as you focus on it as a demonstration of intent. There is no dispute here as to intent insofar as the use to which the *Queen Mary* shall be put. There is no intent—no dispute here as to the intent with which the adjacent pier and land and improvements on land are to be used. But the construction I must arrive at, so it will be clear in the record—at least my approach will be clear, is that the land or improvements to land are not here in existence in the form of the *Queen Mary*, whatever is left of it; that doesn't represent land or improvements to land, in order for me to arrive at Petitioner's or the Plaintiff's desired conclusions."

After further colloquy between the court and Mr. Holston, Mr. Holston stated: "I think that pretty well summarizes it." The court responded: "I would think so. A lot of this is a matter of record. In order to have a clear record—and our independent view that we made today is supplemented by what appears in the record already by way of evidence. So, you don't have to be too careful in worrying about whether you have omitted anything, because it is all included by way of stipulation. Is there anything you would like to add by way of supplement to our view today, Mr. Hegeness? MR. HEGENESS [counsel for plaintiff Specialty Restaurants Corporation]: No. I would like to ask a question. I assume now in—now we are at the trial of this case, and you are going to make your own independent decision, whether it is real or personal property, I assume you will take into account your view as well as your own independent evaluation of the evidence, which was presented to the Board and which we have agreed now you may consider on this facet of the case. Is that right? THE COURT: Yes, that is right. . . . THE COURT: Otherwise there was no purpose in my going there. . . . MR. MERRILL [counsel for plaintiff PSA Hotels, Inc.]: Your Honor, I think with respect to the view, that is something Your Honor will be exercising his own

independent judgment on. . . . We notice the rock walls extending far beyond Pier 'A' to adjoining loading and storage facilities, where automobiles from overseas are unloaded and stored. I think the parking lot, the fencing, the auto access there certainly have alternative uses."

■ While the trial court's view of the *Queen Mary* constituted evidence, it appears from the record that it was merely illustrative of the testimonial and documentary evidence introduced at the trial. This is borne out by the trial judge's statement before the view that he would report his view "into the record" and by the nature of the proceedings set forth hereinabove which occurred immediately after the view. Because of the peculiar nature of the subject matter the only reasonable inference is that the purpose of the view was primarily to enable the trial judge to understand and appreciate the significance of the evidence received by the Board and introduced at the trial by means of the reporter's transcript of the evidence before the Board. Under the circumstances, the only reasonable conclusion is that the view did not add any *substantial* evidence to that otherwise before the court and, consequently, is not sufficient to uphold the judgment if the facts otherwise set forth in the record are not, as a matter of law, sufficient to do so.[3] (Cf. *Fendley* v. *City of Anaheim,* 110 Cal.App. 731, 736 [294 P. 769].) Consequently, our determination that the plaintiffs' property rights in the *Queen Mary* constitute possessory interests in real property for the purpose of taxation is not undermined by the fact that the trial court took a view of the *Queen Mary.*

■ Applying the law as set forth herein with respect to the proper classification of property for tax purposes to the undisputed facts in this

---

[3]In 12 Cal. Law Revision Com. Rep. 591, at pages 592-593, it was stated with respect to the subject of view by the trier of fact in a civil case: "A judge acting as trier of fact may view evidence outside the courtroom. [Fn. omitted.] . . . When the view is independent evidence, it is generally not a part of the record on appeal and the reviewing court will assume that the evidence obtained at the view is sufficient to sustain questioned findings of fact. [Fn. omitted.] [¶] It is undesirable to require the appellate courts to assume the validity of a finding merely because the trial judge has taken a view where there is no indication in the record whether the view sustains the finding. . . ."

Thereafter section 632 of the Code of Civil Procedure was amended and section 651, relating to view by the trier of fact, was added to the Code of Civil Procedure in 1975. A portion of section 632 is now as follows: "Where findings are required and a finding is supported primarily by evidence obtained at a view as provided in Section 651, the court shall so state in its findings and shall also state its observations at the view supporting such finding. The statements required by this paragraph are not required to be stated in the findings where the court includes such statements in its announcement of intended decision."

case, we hold that the trial court erred as a matter of law in determining that "the *Queen Mary* was and is personal property" and that "the possessory interests of plaintiffs in, on and to the *Queen Mary* were and are possessory interests in personal property" and as such are nontaxable. We hold that the respective possessory interests of plaintiffs Specialty Restaurants Corporation and PSA Hotels, Inc., in, on and to the *Queen Mary* are possessory interests in improvements to real property and as such are subject to taxation. (*United States of America* v. *County of Fresno,* 50 Cal.App.3d 633, 638 [123 Cal.Rptr. 548].)

The judgment is reversed and the consolidated cases are remanded to the superior court for further proceedings consistent with the opinion herein.

Allport, J., and Potter, J., concurred.

A petition for a rehearing was denied April 4, 1977, and the petitions of the plaintiffs and respondents for a hearing by the Supreme Court were denied May 5, 1977.