[Civ. No. 57359. Second Dist., Div. Three. Oct. 31, 1980.]

SPECIALTY RESTAURANTS CORPORATION,
Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

PSA HOTELS, INC., Plaintiff and Appellant, v.
CITY OF LONG BEACH et al., Defendants and Respondents.

COUNSEL

Cotten, Day & Doyle and Roger C. Wesley for Plaintiffs and Appellants.

John H. Larson, County Counsel, Dixon M. Holston and Ray G. Fortner, Jr., Deputy County Counsel, for Defendants and Respondents.

OPINION

**ALLPORT, J.**—In these consolidated actions Specialty Restaurants Corporation and PSA Hotels, Inc. (Taxpayers) seek to recover that

portion of possessory interest taxes paid under protest and claimed to have been erroneously assessed and apportioned to the submerged land underlying the vessel *Queen Mary*. Taxpayers' interests are derived from long term leases with the City of Long Beach, owner of the *Queen Mary* project, whereby lessees were given exclusive rights to conduct hotel, food, beverage and other commercial activities on premises located aboard the *Queen Mary*, together with exclusive parking rights on land adjacent thereto and options for use of additional nearby land areas. The leases, under heading "Miscellaneous Provisions Premises" define premises to be "Part of Realty" and: "For all purposes of law relating to leases, conveyances and licenses, leased premises shall at all times be regarded as a permanent fixture to the real property upon which said *Queen Mary* lies."

The trial court found that: "1. At all relevant times herein, to wit tax years 1972-1973, 1973-1974, 1974-1975, each plaintiff has been and is a lessee of premises in, on and to the former vessel *Queen Mary*, in the City of Long Beach, California.

"2. The *Queen Mary*, though moored in navigable waters of the United States, is surrounded by a permanent rock dike enclosure which precludes anything but very minimal movement, e.g., a few inches laterally and approximately seven feet vertically (as determined by the ebb and flow of the tide). That said diked area was intended to be used exclusively for the permanent mooring of the *Queen Mary* and is in fact and at all relevant times herein has been so utilized. . . .

"4. For each of the years under consideration, the assessor arrived at his assessed values by valuing the entire interest of the particular plaintiff, utilizing the capitalization of income method, and then allocating a portion of that value to the submerged land underlying the *Queen Mary*. . . .

"11. Plaintiffs' leases with the City do not specifically include the water and land underlying the *Queen Mary*, but refer to the premises as being permanent fixture to the real property to which the *Queen Mary* is attached. In fact the placement of said premises constitutes a use of the underlying water and submerged land."

From these and other findings it was concluded below that: "4. The value arrived at by the assessor for each plaintiff was a value for the permitted use under the leases (the real property rights conveyed by the

leases) and the allocation of a portion of that value to the submerged land underlying the *Queen Mary* was proper. . . .

"7. The use and possession of the submerged land underlying the leased premises of the plaintiffs, and each of them, constitute a taxable possessory interest to the plaintiffs in that said use and possession are exclusive to plaintiffs, of long term duration, and subserve an independent, private interest/benefit of plaintiffs, to-wit, the conduct of business for profit."

In ordering judgment for defendants, it was decreed that: "1. The interests of plaintiffs Specialty Restaurants and PSA Hotels in and to the land underlying the former vessel *Queen Mary* are sufficiently exclusive, durable, independent, and beneficial to said plaintiffs, and each of them, so as to constitute a taxable possessory interest, to such plaintiffs, and each of them and so as to justify an allocation of a portion of the value of each plaintiff's interest to said underlying land."

Taxpayers appeal from the judgment.

## CONTENTS

■ It is contended that Taxpayers' leaseholds do not embrace any cognizable right, title or interest in the water and land beneath the subject vessel, nor can any such be implied to exist or imputed so as to create taxable possessory interests therein. Parenthetically we note that no attack is made upon the total amount of the assessments but only as to the apportionment of any portion thereof to submerged land. While the tax bills disclose without further definition an apportionment to "land," the argument herein refers to apportionment to "Subjacent Waters and Submerged Land" beneath the vessel.

## DISCUSSION

Despite the elaborate de novo argument herein as to the "absence of a nexus to the underlying land," we deem the decision in *Specialty Restaurants Corp.* v. *County of Los Angeles* (1977) 67 Cal.App.3d 924 [136 Cal.Rptr. 904], persuasive if not controlling of our decision on the issue and of this appeal. In that case this court, after an exhaustive consideration of the facts, determined at page 936: "In the cases presently before us the fact that the *Queen Mary* is integral to the purpose for which the land is used appears to be beyond question. All the improve-

ments made to the land were designed to accommodate the *Queen Mary* as a tourist attraction. It is manifest that the area of real property permanently occupied by the *Queen Mary* is 'peculiarly valuable in use' because of the *Queen Mary's* presence.

"Turning to the question of the manner in which the *Queen Mary* has been annexed to the land, it is manifest that the annexation is substantial. We note the various service lines, the steel mooring lines, the extensive gangway structure, each connecting the ship with the wharf in a permanent manner, and the anti-corrosion device linking the hull to the bottom of the basin. The rock dike enclosing the ship clearly blocks its ready removal from the site." Applying the governing law, we then held at page 942 that: "the respective possessory interests of plaintiffs Specialty Restaurants Corporation and PSA Hotels, Inc., in, on and to the *Queen Mary* are possessory interests in improvements to real property and as such are subject to taxation." While the "land" is not specifically described in that opinion, it is clearly considered to encompass all the real property required to accommodate the vessel as a permanently affixed tourist attraction, including particularly the land underneath the shallow water in which the vessel sits.

It follows like night the day that possessory interests in improvements to real property are dependent for existence on real property. The supporting real property in this case, as delineated in the leases, includes areas aboard the vessel itself (previously determined in *Specialty, supra,* to be real as distinguished from personal property), the real property "upon which said *Queen Mary* lies," as well as that which comprises the parking areas and supports option rights in other facilities guaranteed to Taxpayers by the lease documents.

An assessment of taxable possessory interests must necessarily include the value of the supporting land. To do so in this case is not only logically necessary but legally mandated to insure a proper assessment. Possessory interests are defined in Revenue and Taxation Code section 107 as "Possession of, claim to, or right to the possession of land or improvements . . . ." Certainly the interests described herein fall within that definition. The same code requires in section 607 that "Land and improvements thereon shall be separately assessed." As to apportionment, it was said in *County of Riverside* v. *Palm-Ramon Development Co.* (1965) 63 Cal.2d 534, 540 [47 Cal.Rptr. 377, 407 P.2d 289]: "The assessor was correct in separately assessing the possessory rights in the buildings and in the land. As declared in *Forster Shipbldg. Co.* v.

*County of Los Angeles* (1960) 54 Cal.2d 450, 455 [6 Cal.Rptr. 24, 353 P.2d 736], possessory interests in land are legislatively defined as 'real estate' or 'real property' for purposes of taxation. Further, both the California Constitution (art. XIII, § 2 [now § 13]) and the Revenue and Taxation Code (§ 607) provide that land and the improvements thereon shall be separately assessed."

We see no error in the apportionment of the instant assessment between land and improvements thereon in this case. The so-called "blending" of the possessory interests in the real property under the general heading land without further definition is not fatal to the validity of the assessment. It has not been shown that the total assessments are unreasonable or have been rendered so by blending of valid and void or voidable assessments of any portion of the real property. Such being the case, blending of the various real property aspects of the leashold interests does not invalidate the assessment. Certainly the vessel itself without the supporting land below, alongside and adjacent, would be difficult of use as a profitable tourist attraction and of relatively little value to Taxpayers.

Conceding "a distinct paucity of case authority on the subject," and without citation of controlling or persuasive authority of any description, it is urged the county is estopped to assess these interests by virtue of the failure of the owner, City of Long Beach, to obtain a permit from the Army Corps of Engineers for permanently mooring the *Queen Mary* at the wharf (Pier J). While not considered in *Specialty, supra,* 67 Cal.App.3d 924, the court below in the instant case found:

"The U. S. Army Corps of Engineers issued a permit for the development of the enclosed diked area within which the former vessel *Queen Mary,* now a fixture attached to the land, i.e., an improvement to real property, is contained but did not require an additional permit for the mooring of the *Queen Mary.* That the sole purpose for the erection of the dike was to provide a permanent place of containment for the *Queen Mary.*"

"The City of Long Beach had at all times relevant to this matter the title and ownership of the land underlying the *Queen Mary.* The Federal government had rights in the water underlying the *Queen Mary* as 'navigable waters' as defined in the Submerged Land Act of 1953. The U. S. Army Corps of Engineers had jurisdiction to grant permits to construct obstructions/improvements in these waters. It did issue such a

permit to the City of Long Beach for the construction of a rock dike with the knowledge that said dike was to constitute a permanent enclosure for the *Queen Mary*."

From these facts it was concluded: "The U. S. Army Corps of Engineers has impliedly permitted the location of the *Queen Mary* at its present site by reason of its issuance of an express permit to dredge and construct a rock dike enclosure for the *Queen Mary*."

This situation is further developed below. Under the circumstances the estoppel argument lacks merit.

Finally, stating that "They may not treat the *Queen Mary* as a floating vessel in dealing with the Army Corps of Engineers and, at the same time, characterize the *Queen* as realty for purposes of *ad valorem* taxation," Taxpayers argue that these taxes are discriminatory and place an undue burden on interstate commerce.

It is suggested that, because this is the first time a "floating object such as the *Queen Mary* has ever been subjected to an *ad valorem* possessory interest tax" it is discriminatory. The argument lacks merit. There must always be a first time. Standing alone that fact, if true, does not indicate discrimination.

With respect to interstate commerce Taxpayers argue that the commerce clause was violated because no permit was obtained from the corps "to permanently situate [the vessel] in its present location adjacent to Pier J." The argument belies the facts as found below and supported by substantial evidence. Charles Holt, chief of the Navigation Branch with the U.S. Army Corps of Engineers testified, inter alia:

"Q. Do you know what the criteria are for obtaining a permit to situate—well, I should say to create what would be classified as an obstruction in navigable waters in the United States?

"A. Yes, I do.

"Q. Could you tell us what they are?

"A. All structures and activities in navigable waters in the United States need a permit from the Secretary of the Army through his local district engineer at each of the local districts in the United States.

"Q. Does your office have any guidelines in force as to what would constitute an obstruction in navigable waters in the United States?

"A. Yes, we have many guide lines that would tell us what permits are required for what various activities.

"Q. Can you kind of describe some of the activities that would be included?

"A. Offshore oil drilling is one. Dredging and filling along the coast is one. Rock riveted slopes for wave action and protection is one. Detached breakwaters or offshore breakwaters similar to the breakwaters off of Los Angeles, Long Beach Harbor requires a permit. Similar activities as such. Boat docks, boat slips, piers, bulkheads.

"MR. WESLEY: Your Honor, I would like to have the witness identify an exhibit. May I approach the witness.

"THE COURT: Surely.

"MR. WESLEY: I would like this identified for the time being as Plaintiff's Exhibit No. 3, purports to be a picture aerially of the *Queen Mary*.

"Q. Do you recognize that photograph?

"A. Yes, I do. This is a blown-up copy of an aerial photograph that I provided you when you were in my office or made access to you to have blown up by some private firm, showing the location of the *Queen Mary* in its diked area.

"Q. That document or the negative, would that be under your custody—

"A. Yes, it is.

"Q. —with the Army Corps?

"A. Right.

"Q. Now, are you familiar with the *Queen Mary*?

"A. I've been on the *Queen*, and I've seen the site several times both from the air and on land, yes.

"Q. Does your office have occasion to issue any kind of permit for any facilities directly in connection with the *Queen Mary*?

"A. Yes, we did. It was prior to my time; however, I do have the records that show the type of permit we did issue.

"MR. WESLEY: Your Honor, may I approach the witness again.

"THE COURT: Surely.

"MR. WESLEY: This purports to be a permit issued by the Department of the Army. May I have this identified as Plaintiff's Exhibit No. 4.

"Q Mr. Holt, do you recognize that permit?

"A. Yes, I do.

"Q. Can you describe it for the court?

"A. This is a typical permit that we issue for activities in navigable waters in the United States, and this is similar to the one I have on file as the original on the one we issued in 1974, a diked area, 80 cubic yards of dredging for the site of the *Queen Mary* at Pier J.

"Q. Do you consider the waters in which the *Queen* is presently situated to be navigable waters in the United States?

"A. Yes, we do.

"Q. Under what criteria?

"A. Under the Code of Federal Regulations 334—409, I believe it is.

"Q. Is it fair to say your office classifies these waters as navigable waters of the United States?

"A. That is correct.

"Q. Were they so classified at the time this permit was issued?

"A. That is correct. Since 1899, Rivers and Harbors Act of 1899.

"Q. Was any other permit issued with respect to the *Queen Mary*?

"A. Not by our office.. We have not issued any other permits in connection with this.

"Q. I take it, then, no permit was issued to permanently situate the *Queen* in its present location adjacent to Pier J?

"A. No.

"Q. Was any permit sought by the City of Long Beach or any other entity—

"A. Not to my knowledge.

"Q. —to so situate the *Queen*?

"A. As far as I can gather from the information, there was not.

"Q. To your knowledge, was there ever any inquiry made by any City of Long Beach official or any other entity for the need of such a permit?

"A. Not to my knowledge."

It is clear from this testimony that the city complied with the permit requirements of the Department of the Army. While Holt testified no permit was issued to permanently situate the *Queen* in its present location adjacent to Pier J, such was not required. This is demonstrated by Holt's further testimony:

"Q. *So at this time, then, your office requires no permit that you are aware of for situating the Queen in its present location?*

"A. *We do not.*

"Q. I'm going to ask you a hypothetical, Mr. Holt. If your office had past or present considered the *Queen Mary* to be an improvement,

a permanent improvement, to realty, would it have required the City of Long Beach to obtain a permit to have situated it at its present location?

"A. Yes." (Italics added.)

The response to the examiner's hypothetical question does not support a contrary conclusion in the instant case. It is not evident that a *second or additional* permit would have been required even if his office had considered the *Queen* to be other than a floating vessel. Under the circumstances, it has not been demonstrated to our satisfaction that the failure to obtain a permit or otherwise resulted in "a local obstruction to the flow of interstate commerce" and for that reason does violence to the commerce clause.

## DISPOSITION

The judgment under appeal is affirmed.

Cobey, Acting P. J., and Potter, J., concurred.

A petition for a rehearing was denied November 21, 1980.