[No. H032375. Sixth Dist. Oct. 23, 2009.]

KENNETH WUNDERLICH et al., Plaintiffs and Respondents, v. COUNTY OF SANTA CRUZ et al., Defendants and Appellants.

## COUNSEL

Dana McRae, County Counsel, and Dwight L. Herr, Special Counsel, for Defendants and Appellants.

Edmund G. Brown, Jr., Attorney General, and Paul D. Gifford, Assistant Attorney General, for California State Board of Equalization as Amicus Curiae on behalf of Defendants and Appellants.

Beck & Mathiesen and David R. Beck for Plaintiffs and Respondents.

Trevor A. Grimm, Jonathan M. Coupal and Timothy A. Bittle for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

Susan D. Blake for State Board of Equalization Members Bill Leonard and Michelle Steel as Amicus Curiae on behalf of Plaintiffs and Respondents.

Letwak & Bennett and Stephen H. Bennett as Amicus Curiae on behalf of Plaintiffs and Respondents.

OPINION

**McADAMS, J.**—In this case of first impression, we are called upon to interpret Proposition 60, voter-enacted constitutional tax relief implemented through legislation. (Cal. Const., art. XIII A, § 2, subd. (a); Rev. & Tax. Code, § 69.5.) Proposition 60 allows qualified homeowners to transfer the property tax basis of their principal residence to a replacement dwelling of equal or lesser value. The dispute in this case concerns valuation of the replacement dwelling. The specific issue before us is this: When an applicant for Proposition 60 tax relief builds a new residence on land purchased years earlier, is the value of the replacement dwelling calculated using the land's current value (its fair market value when construction is complete) or the land's historic value (its base year value under Prop. 13)? We conclude that the land must be valued currently, as of the date that construction of the structure is completed. We therefore reverse the summary judgment granted to the homeowners here.

## BACKGROUND

The parties to this appeal are plaintiffs and respondents Kenneth Wunderlich and Jeanette Engelhart (the homeowners), and defendants and appellants the County of Santa Cruz and its assessor (the County). The pertinent facts are undisputed.[1]

The homeowners owned a home at 520 Stagg Lane, Santa Cruz (the original property). They sold the original property in January 2004 for $830,000. At that time, it had a property tax basis of $187,992.

The homeowners also owned a lot across the street at 521 Stagg Lane, which they purchased in 1979; they constructed a new home on the lot, which was completed in June 2004 (the replacement dwelling). After construction was complete, the County assessed the replacement dwelling at $730,877 for property tax purposes under Proposition 13, specifying improvements at $668,400 and land at $62,477 (its base year value).

The homeowners applied to the County for transfer of the property tax basis of their original property to the replacement dwelling. For Proposition 60 purposes, the County assessed the replacement dwelling at $900,000, specifying improvements at $668,400 and land at $231,600 (its then current fair market value). Since the assessed value of the replacement dwelling

---

[1] This appeal comes to us on an agreed fact statement that the parties submitted in the trial court, which we rely on here. (*Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 782, fn. 1 [131 Cal.Rptr.2d 347].)

exceeded 105 percent of the value of the original property, the County refused to transfer the homeowners' property tax basis to the replacement dwelling.

After exhausting administrative appeals, the homeowners sued the County, seeking declaratory, injunctive, and writ relief. The County interposed a demurrer, which the court overruled.

In April 2007, the homeowners moved for summary judgment. The court granted the motion. In October 2007, the court entered judgment for the homeowners.

The County filed this timely appeal from the judgment. We granted four requests for leave to file briefs as amici curiae.[2] We also granted two requests for judicial notice.[3]

## CONTENTIONS

The County contends that it correctly valued the land component of the replacement dwelling for Proposition 60 purposes. In support of its contention, the County cites the language of the governing provisions, the intent of the initiative and its implementing legislation, and instructions concerning the assessment of replacement dwellings issued by the State Board of Equalization (the Board).

The homeowners disagree. In their view, the applicable statute directs the County to use the same method of assessing the land both for Proposition 13 and for Proposition 60.

## DISCUSSION

To establish the proper framework for our analysis, we first summarize pertinent general principles of property taxation before turning to the specific provisions at issue here.

---

[2] Three amicus curiae briefs were filed in support of the homeowners: one by the Howard Jarvis Taxpayers Association; a second by Bill Leonard and Michelle Steel, members of the State Board of Equalization; and a third by Stephen H. Bennett, a certified public accountant. One amicus curiae brief was filed in support of the County, by the State Board of Equalization.

[3] In one request, the County seeks judicial notice of an excerpt from the Proposition 60 ballot pamphlet. In the other request, the State Board of Equalization, as amicus curiae, submits three exhibits for judicial notice: two of its letters to all county assessors, one dated March 19, 2002, and the other dated February 6, 2006, plus an excerpt from the Proposition 60 ballot pamphlet.

Despite having taken judicial notice of these documents, we need not rely on them in resolving this proceeding. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261]; *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 30 [34 Cal.Rptr.3d 520].)

## I. Overview: Property Taxation

### A. Ad Valorem Taxation

▪ In California, all nonexempt property is subject to ad valorem taxation. (*Jensen v. Byram* (1964) 229 Cal.App.2d 651, 652 [40 Cal.Rptr. 540], disapproved on another point in *Bauer-Schweitzer Malting Co. v. City and County of San Francisco* (1973) 8 Cal.3d 942, 948 [106 Cal.Rptr. 643, 506 P.2d 1019]; Rev. & Tax. Code, §§ 201, 2202.)[4] "An ad valorem tax is a tax levied on property in proportion to its value, as determined by assessment or appraisal." (*American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1124 [51 Cal.Rptr.2d 251, 912 P.2d 1198].)

#### 1. Valuation

▪ The starting point for assessing property is its full value. " 'Full value' means fair market value, full cash value, or such other value standard as is prescribed by the Constitution or [the Revenue and Taxation Code] under the authorization of the Constitution." (§ 110.5; see *ITT World Communications, Inc. v. County of Santa Clara* (1980) 101 Cal.App.3d 246, 251 [162 Cal.Rptr. 186].)

Assessed value is derived from full value. It is determined as a percentage of the property's full value, either its "fair market value" or "a value standard other than fair market value" where constitutionally authorized. (Cal. Const., art. XIII, § 1, subd. (a); see *City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 565, fn. 5 [41 Cal.Rptr.2d 888, 896 P.2d 181]; *id.* at p. 566; 1 Ehrman & Flavin, Taxing Cal. Property (4th ed. 2008) § 3:1, p. 3-2, fn. 1.)

#### 2. Equalization

▪ The California "Constitution requires all property subject to taxation to be assessed at the same percentage of . . . value; i.e., there must be uniformity of assessment." (*Shafer v. State Bd. of Equalization* (1985) 174 Cal.App.3d 423, 429 [220 Cal.Rptr. 59], discussing Cal. Const., art. XIII, § 1.) " 'Adjustment of assessment levels of various categories of property to a uniform percentage of full value is called "equalization." ' " (*American Airlines, Inc. v. County of San Mateo, supra*, 12 Cal.4th at p. 1124.)

It is the Board's function "to equalize on the basis of fractional assessments to full cash value." (*Hanks v. State Board of Equalization* (1964) 229

---

[4] Unspecified statutory citations are to the Revenue and Taxation Code.

Cal.App.2d 427, 432 [40 Cal.Rptr. 478]; see Cal. Const., art. XIII, § 18.) To carry out that function, the Board is charged with prescribing "rules and regulations to govern local boards of equalization when equalizing, and assessors when assessing" property. (Gov. Code, § 15606, subd. (c).) The Board is also required to "issue instructions to assessors designed to promote uniformity throughout the state and its local taxing jurisdictions in the assessment of property for the purposes of taxation." (*Id.*, subd. (e); see also Gov. Code, § 15608.)

### 3. *Assessment of Real Property*

■ For taxation purposes, real property includes both land and improvements. (§ 104; see also § 69.5, subd. (g)(3); Cal. Const., art. XIII A, § 2, subd. (a).) The two components are "separately assessed." (§ 607; Cal. Const., art. XIII, § 13.) Both are subject to taxation. (*Jensen v. Byram, supra*, 229 Cal.App.2d at p. 652 [county could recover taxes as escaped assessments, where "land was assessed and taxes were paid, but through oversight, there was no assessment of improvements . . ."].) The separate assessment provisions mandate "that the distinction be carried into the tax rolls for the purpose of equalizing separately the assessments on land and on improvements." (*Krouser v. County of San Bernardino* (1947) 29 Cal.2d 766, 769 [178 P.2d 441].)

### B. *Proposition 13*

■ "In 1978, the voters adopted Proposition 13, which became article XIII A of the California Constitution. Article XIII A limits both the valuation of real property for tax purposes and the maximum tax rate that can be imposed on the resulting real property valuation." (*City and County of San Francisco v. County of San Mateo, supra*, 10 Cal.4th at p. 561.) "Article XIII A's purpose was to restrict the taxation of real property generally by limiting the growth in valuation of real property and by limiting the maximum tax rate imposed on real property." (*Id.* at p. 569.)

### 1. *Valuation*

■ Under Proposition 13, a base year value for real property is established, which is dependent on the property acquisition date. (§ 110.1.) For property owned at the 1975 lien date, Proposition 13 limits its value "to the 1975–1976 'full cash value' of the property, increased for inflation by a

maximum of 2 percent annually." (*City and County of San Francisco v. County of San Mateo, supra,* 10 Cal.4th at p. 561, citing art. XIII A, § 2, subds. (a), (b); see § 110.1, subd. (a)(1).) For property acquired after 1975, the base year value is determined as of the date of purchase, new construction, or change in ownership. (§§ 110.1, subd. (a)(2), 75.8; *City and County of San Francisco v. County of San Mateo,* at pp. 565–566.) As with property owned at the 1975 lien date, the base year value of these later acquired properties will increase at a maximum rate of 2 percent per year. (§§ 110.1, subd. (f), 51, subd. (a); Cal. Code Regs., tit. 18, § 460, subd. (b)(5).)

Proposition 13 thus "established an 'acquisition value' tax for real property in California." (1 Ehrman & Flavin, Taxing Cal. Property, *supra,* § 3:1, p. 3-2.) In other words, "Proposition 13 abandons the annual lien date revaluation principle." (*Id.,* § 11:2, p. 11-3.) Under Proposition 13, "the only time full cash value equals fair market value is in the year when real property subject to appraisal at fair market value is first purchased, newly constructed, or otherwise changes ownership." (*City and County of San Francisco v. County of San Mateo, supra,* 10 Cal.4th at p. 566.) But additions, alterations, or other changes to existing property may trigger a partial reassessment under Proposition 13, such that a new base year value will be established for the newly constructed portion of the property. (§ 71; Cal. Code Regs., tit. 18, § 463, subd. (a); see generally 2 Ehrman & Flavin, Taxing Cal. Property, *supra,* § 23:10, pp. 23-15 to 23-16.)

2. *Tax Rate*

■ In addition to its constraints on valuation, Proposition 13 also "limits the maximum tax rate to 1 percent." (*City and County of San Francisco v. County of San Mateo, supra,* 10 Cal.4th at p. 561, citing art. XIII A, § 1, subd. (a).)

C. *Subsequent Tax Relief Initiatives*

In a series of voter-enacted initiatives that followed the approval of Proposition 13, the California electorate authorized the Legislature to permit the transfer of a property's base year value to a replacement property under some circumstances. (See generally 1 Ehrman & Flavin, Taxing Cal. Property, *supra,* § 11:11, pp. 11-17 to 11-19.)

■ In November 1986, the voters approved Proposition 60, the measure at issue here. In brief, Proposition 60 is a constitutional amendment authorizing legislation to permit qualified homeowners over 55 years of age (seniors)

to transfer their base year value to a replacement dwelling of equal or lesser value within their county. (Cal. Const., art. XIII A, § 2, subd. (a).) In November 1988, the voters approved Proposition 90, a further constitutional amendment enabling the transfer of base year values between counties, upon the adoption of implementing legislation and of qualifying local ordinances. (Cal. Const., art. XIII A, § 2, subd. (a).) In the 1990's, California's voters authorized the extension of base year transfers to two other classes of property owners besides seniors: disabled homeowners and owners of contaminated property.[5]

The Legislature implemented these constitutional provisions. As relevant here, section 69.5 governs transfers of base year values by seniors.[6]

II. *Proposition 60: Overview*

As just noted, Proposition 60 arose from a voter initiative amending the California Constitution, which the Legislature implemented through section 69.5.

A. *The Constitutional Provision*

In pertinent part, the enabling constitutional provision states that "the Legislature may provide that . . . any [qualified] person over the age of 55 years who resides in property that is eligible for the homeowner's exemption . . . may transfer the base year value of the property . . . to any replacement dwelling of equal or lesser value located within the same county and purchased or newly constructed by that person as his or her principal residence within two years of the sale of the original property." (Cal. Const., art. XIII A, § 2, subd. (a).)

---

[5] Proposition 110 was approved in June 1990, further amending the Constitution to authorize legislative action permitting disabled homeowners to transfer their base year values to replacement dwellings. (Cal. Const., art. XIII A, § 2, subd. (a).) November 1998 saw the approval of Proposition 1, a constitutional amendment authorizing legislation for the transfer of base year values by owners of contaminated properties. (Cal. Const., art. XIII A, § 2, subd. (i).)

[6] Section 69.5 also governs transfers of base year values by "severely and permanently disabled" homeowners. (§ 69.5, subd. (a)(1).) Section 69.4 covers transfers by owners of contaminated properties. (§ 69.4, subd. (a)(1).)

Though section 69.4 is not at issue here, we note that it defines "equal or lesser value" in similar terms as section 69.5, subdivision (g)(5). The last paragraph of section 69.4, subdivision (e)(2), thus provides: "For purposes of this paragraph, if the replacement property is, in part, purchased and, in part, newly constructed, the date the replacement property is 'acquired or newly constructed' is the date of acquisition or the date of completion of construction, whichever is later."

## B. *Legislative Implementation*

Section 69.5 implements the constitutional amendment. That statute appears in the Revenue and Taxation Code in division 1, part 0.5 ("Implementation of Article XIII A of the California Constitution"), chapter 2 ("Change in Ownership and Purchase"). Section 69.5, subdivision (a), provides the implementing language, which largely mirrors that of the constitutional provision.[7]

Key terms are defined in section 69.5, subdivision (g).[8] Among them is "equal or lesser value." (§ 69.5, subd. (g)(5).) Under that statutory definition, "if the replacement dwelling is, in part, purchased and, in part, newly constructed, the date the 'replacement dwelling is purchased or newly constructed' is the date of purchase or the date of completion of construction, whichever is later." (*Ibid.*)

## III. *Proposition 60: Analysis*

With the foregoing principles and provisions in mind, we now consider the specific question presented here: In determining whether the replacement dwelling is of equal or lesser value when compared to the original property, how should the value of the land component of the replacement dwelling be calculated?

---

[7] Section 69.5, subdivision (a), states in pertinent part: "(a)(1) Notwithstanding any other provision of law, pursuant to subdivision (a) of Section 2 of Article XIII A of the California Constitution, any person over the age of 55 years . . . who resides in property that is eligible for the homeowners' exemption . . . may transfer, subject to the conditions and limitations provided in this section, the base year value of that property to any replacement dwelling of equal or lesser value that is located within the same county and is purchased or newly constructed by that person as his or her principal residence within two years of the sale by that person of the original property, provided that the base year value of the original property shall not be transferred to the replacement dwelling until the original property is sold."

[8] Section 69.5, subdivision (g), states in pertinent part:

"For purposes of this section: [¶] . . . [¶]

"(2) 'Base year value of the original property' means its base year value, as determined in accordance with Section 110.1, with the adjustments permitted by subdivision (b) of Section 2 of Article XIII A of the California Constitution and subdivision (f) of Section 110.1, determined as of the date immediately prior to the date that the original property is sold by the claimant. . . .

"If the replacement dwelling is purchased or newly constructed after the transfer of the original property, 'base year value of the original property' also includes any inflation factor adjustments permitted by subdivision (f) of Section 110.1 for the period subsequent to the sale of the original property. The base year or years used to compute the 'base year value of the original property' shall be deemed to be the base year or years of any property to which that base year value is transferred pursuant to this section.

"(3) 'Replacement dwelling' means a building, structure, or other shelter constituting a place of abode, whether real property or personal property, that is owned and occupied by a claimant as his or her principal place of residence, and any land owned by the claimant on which the building, structure, or other shelter is situated. . . .

"(4) 'Original property' means a building, structure, or other shelter constituting a place of abode, whether real property or personal property, that is owned and occupied by a claimant as

The County urges the use of current land value. In its view, the plain language of the statute—particularly section 69.5, subdivision (g)(5)—calls for valuation of the land as of the date that construction of the structure is complete. This same interpretation has been adopted by the Board.[9]

For their part, the homeowners argue for use of the land's historic value. As they view the law's intent, the base year value of the land as determined under Proposition 13 is also the proper measure of its value for purposes of Proposition 60. In pressing this argument, the homeowners principally rely on section 69.5, subdivision (g)(6).

---

his or her principal place of residence, and any land owned by the claimant on which the building, structure, or other shelter is situated. . . .

"(5) 'Equal or lesser value' means that the amount of the full cash value of a replacement dwelling does not exceed one of the following:

"(A) One hundred percent of the amount of the full cash value of the original property if the replacement dwelling is purchased or newly constructed prior to the date of the sale of the original property.

"(B) One hundred and five percent of the amount of the full cash value of the original property if the replacement dwelling is purchased or newly constructed within the first year following the date of the sale of the original property.

"(C) One hundred and ten percent of the amount of the full cash value of the original property if the replacement dwelling is purchased or newly constructed within the second year following the date of the sale of the original property.

"For the purposes of this paragraph, except as otherwise provided in paragraph (4) of subdivision (h), if the replacement dwelling is, in part, purchased and, in part, newly constructed, the date the 'replacement dwelling is purchased or newly constructed' is the date of purchase or the date of completion of construction, whichever is later.

"(6) 'Full cash value of the replacement dwelling' means its full cash value, determined in accordance with Section 110.1, as of the date on which it was purchased or new construction was completed, and after the purchase or the completion of new construction."

[9] The Board's interpretation is reflected in its letters to all assessors issued in March 2002 and February 2006, which we have judicially noticed.

The Board's March 2002 letter states: "In calculating the *full cash value* of a newly constructed replacement property, both the land and the improvements must be reappraised at the time of completion . . ." with the value of previously owned land "adjusted at current market (full cash) value . . . when construction of the replacement dwelling is completed."

In its February 2006 letter, the Board attached a set of questions and answers about section 69.5. That attachment includes this question and answer: "L2: If a lot is purchased and a home constructed, how is the new construction valued? [¶] Answer. The assessor must determine the full cash value of the improved property as of the date of completion. A simple summation of the purchase price of the lot plus the cost of construction might not accurately reflect the full cash value of the replacement property upon completion of construction." (Boldface omitted.)

The Board reaffirmed its position in an opinion letter issued in this case, dated August 2005. In that letter, the Board rejected the homeowners' contention that the assessor should use "the appraised value for property tax purposes, not the fair market value." After summarizing relevant statutory provisions, the Board concluded that "the value standard to be used for the replacement property for purposes of section 69.5 is the fair market value of the land and improvements as of the date of completion of new construction."

As both parties acknowledge, the question before us is one of statutory interpretation.

### A. *Principles of Appellate Review*

■ The interpretation of constitutional or statutory provisions presents a legal question, which we decide de novo. (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 [45 Cal.Rptr.3d 394, 137 P.3d 218].) Our task is to ascertain the intent of the electorate or the Legislature, thereby giving effect to the law's purpose. (*Preston v. State Bd. of Equalization* (2001) 25 Cal.4th 197, 213 [105 Cal.Rptr.2d 407, 19 P.3d 1148].)

We begin by examining the language of the relevant provisions. (*Smith v. Superior Court, supra,* 39 Cal.4th at p. 83.) Where "intent is expressed in unambiguous terms, we must treat the statutory language as conclusive; 'no resort to extrinsic aids is necessary or proper.' " (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 61 [124 Cal.Rptr.2d 507, 52 P.3d 685]; see also, e.g., *Preston v. State Bd. of Equalization, supra,* 25 Cal.4th at p. 213.)

On the other hand, where "the provision's words are ambiguous and open to more than one meaning, we consult the legislative history, which in the case of article XIII A is the ballot pamphlet." (*City and County of San Francisco v. County of San Mateo, supra,* 10 Cal.4th at p. 563.)

"In cases of ambiguity we also may consult any contemporaneous constructions of the constitutional provision made by the Legislature or by administrative agencies." (*City and County of San Francisco v. County of San Mateo, supra,* 10 Cal.4th at p. 563.) As to the latter, however, "the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

"Finally, the court may consider the impact of an interpretation on public policy . . ." when construing an ambiguous provision. (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663 [3 Cal.Rptr.3d 390, 74 P.3d 166].) Absurd results are to be avoided. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196]; Civ. Code, § 3542.)

### B. *Discussion*

Interpreting the governing statutory provisions in this case of first impression, we conclude that they compel valuation of both the land and the

structure as of a single date. In this case, that date was in June 2004, when construction of the structure was complete. We reach that conclusion based on statutory language alone. The statute—section .69.5—has been aptly described as "extraordinarily complex" with "pages of dense, convoluted and interrelated provisions." (1 Ehrman & Flavin, Taxing Cal. Property, *supra*, § 11:11, p. 11-23.) But as we explain below, the specific provisions that concern us here are expressed in clear and unambiguous terms. Thus, it is neither necessary nor proper to consider extrinsic aids to interpretation, such as legislative history. (*Equilon Enterprises v. Consumer Cause, Inc., supra*, 29 Cal.4th at p. 61; *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc., supra*, 133 Cal.App.4th at p. 30.)

### 1. *Components of the Replacement Dwelling*

■ By statutory definition, the "replacement dwelling" consists of two components, the "building, structure, or other shelter constituting a place of abode," and the land on which that structure is situated. (§ 69.5, subd. (g)(3).) Unimproved land does not qualify for Proposition 60 tax relief, which is available only for a dwelling occupied as the owner's principal residence. (§ 69.5, subds. (a)(1), (g)(10); see § 218; Cal. Const., art. XIII, § 3, subd. (k); *Smith v. State Bd. of Equalization* (1997) 53 Cal.App.4th 331, 334 [61 Cal.Rptr.2d 604].)

As noted above, land and improvements must be separately assessed. (§ 607; Cal. Const., art. XIII, § 13.) Even so, the replacement dwelling— including both land and structure—is properly treated as a single unit. (See § 69.5, subd. (g)(3).) "For property tax purposes, the unit to be valued ordinarily is the one normally dealt with in the market. In the case of real property, this is usually both the land and its improvements . . . ." (2 Ehrman & Flavin, Taxing Cal. Property, *supra*, § 17:7, p. 17-20.) "Although a separate *assessment* is required for land and improvements, separate *appraisals* of the value of each are not." (*Id.* at p. 17-21, italics added, fn. omitted; cf. *Specialty Restaurants Corp. v. County of Los Angeles* (1980) 111 Cal.App.3d 607, 612 [168 Cal.Rptr. 827] [where "the total assessments" for real and personal property were not unreasonable, the "blending of the various real property aspects of the leasehold interests [did] not invalidate the assessment"].)

In this case, the County did assess the land and improvements separately, as required by the governing statutory and constitutional provisions. The only disputed question is the proper date for the land valuation.

### 2. *Valuing the Replacement Dwelling: Subdivision (g)(5)*

The specific provision that defines "equal or lesser value" says "if the replacement dwelling is, in part, purchased and, in part, newly constructed,

the date the 'replacement dwelling is purchased or newly constructed' is the date of purchase *or* the date of completion of construction, *whichever is later.*" (§ 69.5, subd. (g)(5), italics added.)

In this case, the replacement dwelling was "in part, purchased," the land having been acquired in 1979. (§ 69.5, subd. (g)(5).) And it was "in part, newly constructed," construction of the structure having been completed in 2004. (*Ibid.*) Under the statute, the relevant date is the later of the two. (*Ibid.*) Applying the plain terms of this provision to the undisputed facts of this case, the replacement dwelling—both land and structure—must be assessed as of 2004, when construction of the structure was completed.

The homeowners resist this interpretation. As they see it, the last paragraph of section 69.5, subdivision (g)(5), operates only to determine which statutory inflation multiplier to use.[10] They argue: "It is not for determining date of valuation."

 We are not persuaded by the homeowners' argument on this point. The language of the provision does not support the homeowners' proffered interpretation. In defining equal or lesser value, the last paragraph of section 69.5, subdivision (g)(5) explicitly sets the determinative date as the *later* of purchase *or* construction. It offers no basis for valuing land and improvements on two different dates. To the contrary, it requires the choice of a single date for valuing the replacement dwelling as a unit.

3. *Valuing the Replacement Dwelling: Subdivision (g)(6) and Section 110.1*

Apart from their interpretation of section 69.5, subdivision (g)(5), the homeowners also assert that other statutory provisions compel their proffered construction. The homeowners particularly rely on section 69.5, subdivision (g)(6), together with the provision that it cross-references, section 110.1.

Section 69.5, subdivision (g)(6), provides this definition: " 'Full cash value of the replacement dwelling' means its full cash value, determined in accordance with Section 110.1, as of the date on which it was purchased or new construction was completed, and after the purchase or the completion of

---

[10] To illustrate that point, the homeowners offer this example: "If a Proposition 60 claimant sold his original property in year 1; bought replacement dwelling **land** in year 2; then completed construction of the replacement dwelling residence in year 3 on the land he bought in year 2; is he under [section 69.5, subdivision (g)(5)] (B), the 105% rule, or is he under (C), the 110% rule? [¶] The last paragraph of § 69.5(g)(5) gives the answer. [It is] (C), the **later** of the purchase (which occurred in year 2) or the completion of the construction (which occurred in year 3)."

new construction." (§ 69.5, subd. (g)(6).) As relevant here, section 110.1 defines full cash value as the property's fair market value on the date it "is purchased, is newly constructed, or changes ownership after the 1975 lien date . . . ." (§ 110.1, subd. (a)(2).)[11]

According to the homeowners, section 110.1 requires valuation of the replacement dwelling based on two different dates: one for the land, which was purchased in 1979, and another for the structure, whose construction was completed in 2004. The homeowners stress that section 110.1 speaks in terms of full cash value, which is a distinct concept from fair market value under Proposition 13. (See *City and County of San Francisco v. County of San Mateo, supra*, 10 Cal.4th at p. 565, fn. 5.)

■ We find nothing in either of the cited provisions that mandates separate valuation dates for the land and structure. Section 69.5, subdivision (g)(6), provides for valuation of the replacement dwelling "as of *the date* on which it was purchased *or* new construction was completed . . . ." (§ 69.5, subd. (g)(6), italics added.) That language plainly contemplates a single date for valuation—*either* the date of purchase *or* the date of completion of construction. On its face, section 110.1 similarly suggests an "either/or" proposition, with full cash value established *either* when the replacement dwelling is purchased *or* when it is newly constructed. (§ 110.1, subd. (a)(2).)[12]

### 4. *Time for Valuing the Replacement Dwelling: Other Provisions*

Our conclusion in this case is further buttressed by other portions of section 69.5 that address timing issues.

■ One such timing provision appears in section 69.5, subdivision (h). That subdivision mandates transfer of the base year value of the original

---

[11] Section 110.1, subdivision (a), reads in full as follows:

"(a) For purposes of subdivision (a) of Section 2 of Article XIII A of the California Constitution, 'full cash value' of real property, including possessory interests in real property, means the fair market value as determined pursuant to Section 110 for either of the following:

"(1) The 1975 lien date.

"(2) For property which is purchased, is newly constructed, or changes ownership after the 1975 lien date, either of the following:

"(A) The date on which a purchase or change in ownership occurs.

"(B) The date on which new construction is completed, and if uncompleted, on the lien date."

[12] This is evident in the current statutory language, quoted above in footnote 11. It is even more evident in superseded statutory language. Before section 110.1 was amended in 1985, the word "or" appeared at the end of subdivision (a)(2)(A). (See Stats. 1985, ch. 186, § 11, p. 1139; Historical and Statutory Notes, West's Ann. Rev. & Tax. Code (2009 ed.) foll. § 110.1, p. 66.)

dwelling to the replacement dwelling if the homeowner has submitted a proper and timely claim for relief. As relevant here, subdivision (h) requires the assessor to "adjust the new base year value of the replacement dwelling . . . as of the *latest* of the following dates: [¶] (A) The date the original property is sold. [¶] (B) The date the replacement dwelling is purchased. [¶] (C) The date the new construction of the replacement dwelling is completed." (§ 69.5, subd. (h)(1), italics added.)[13] Here, the latest of the three relevant dates is completion of construction of the replacement dwelling's structure.

▅▅▅ Another provision that bolsters our conclusion appears in section 69.5, subdivision (j). As provided in the pertinent part of that subdivision, section 69.5 applies to replacement dwellings that have been purchased or newly constructed by seniors after November 6, 1986 (for intracounty transfers), or November 9, 1988 (for intercounty transfers).[14] The homeowners' 1979 land purchase obviously predates the applicable November 1986 threshold provided in subdivision (j). And as this court has previously observed, "there is a long-standing and well-established presumption against the retroactive application of statutes." (*In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 171 [110 Cal.Rptr.2d 111]; see *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1209 [246 Cal.Rptr. 629, 753 P.2d 585] ["the absence of any express provision directing retroactive application strongly supports prospective operation . . ." of the initiative measure at issue there].) It thus appears that the homeowners' 1979 land purchase is outside the temporal scope of the statute.

In an attempt to counter this conclusion, the homeowners offer an alternative reading of section 69.5, subdivision (j). In their view, the specified date in November 1986 for seniors' intracounty transfers does not represent the outside temporal reach of the statute, but instead simply "was the first day a person could apply for Proposition 60 relief." Considering section 69.5 as a

---

[13] The pertinent part of section 69.5, subdivision (h), reads in full as follows:

"(h)(1) Upon the timely filing of a claim described in subparagraph (F) of paragraph (1) of subdivision (f), the assessor shall adjust the new base year value of the replacement dwelling in conformity with this section. This adjustment shall be made as of the latest of the following dates:

"(A) The date the original property is sold.

"(B) The date the replacement dwelling is purchased.

"(C) The date the new construction of the replacement dwelling is completed."

[14] Section 69.5, subdivision (j), thus states in pertinent part:

"(1) With respect to the transfer of base year value of original properties to replacement dwellings located in the same county, this section . . . shall apply to any replacement dwelling that is purchased or newly constructed on or after November 6, 1986.

"(2) With respect to the transfer of base year value of original properties to replacement dwellings located in different counties . . . , this section . . . shall not apply to any replacement dwelling which was purchased or newly constructed before November 9, 1988."

whole in the context of the presumption against retroactivity, we find the homeowners' argument unpersuasive.

### 5. Interplay with Proposition 13 Valuation Principles

In their insistence on treating acquisition of the land and construction of the structure as discrete events, the homeowners urge a Proposition 13 valuation analysis. Under that scheme, county assessors are required to "determine the new base year value for the portion of any taxable real property which has been newly constructed." (§ 71.)

However, it is important to bear in mind that the issue in this case is not governed by Proposition 13. Rather, it is controlled by Proposition 60, as implemented through section 69.5. Although Proposition 60 grew out of Proposition 13, the two are distinct. And nothing in the plain language of section 69.5 warrants wholesale incorporation of Proposition 13 valuation principles into that statute. To the contrary, Proposition 60 represents an exception to those provisions of Proposition 13 that trigger a new base year value on change of ownership. By allowing seniors to avoid the impact of Proposition 13's change of ownership provisions, Proposition 60 grants additional tax relief. But that relief is available only to those who qualify under the specific provisions set forth in section 69.5.

The homeowners nevertheless assert that the County's interpretation of section 69.5, which we adopt here, "would lead to the absurd result of requiring it to keep 'two sets of books.'" That assertion reflects a fundamental misunderstanding of the interplay between Proposition 13, which affords ongoing property tax relief, and Proposition 60, which permits a one-time-only basis transfer. Each of the two schemes has its own unique role in providing property tax relief, as this case demonstrates. Here, the homeowners have not lost the protection of Proposition 13 for the land that they purchased in 1979; that component of their property retains its historic base year value for property tax purposes. On the other hand, however, the homeowners have not gained the additional tax relief provided by Proposition 60, because their replacement dwelling—assessed as a unit as of the completion of construction of the structure—does not meet the "equal or lesser" test of section 69.5.

### 6. Conclusion

Under section 69.5, subdivision (g)(5), the replacement dwelling—including both land and structure—must be valued as of a single date, either the date that the property was purchased or the date that construction of the structure was complete, whichever is later. Here, the later date is June 2004,

when construction of the structure was complete; the replacement dwelling was properly valued as a unit as of that date. A contrary conclusion is neither compelled nor suggested by section 69.5, subdivision (g)(6), or section 110.1, subdivision (a), or any other provision implementing Proposition 60.

## DISPOSITION

We reverse the judgment for respondent homeowners, and we remand the matter to the trial court with directions to vacate its order granting respondents' summary judgment motion and to enter a new order denying that motion.

**MIHARA, J.,** Concurring.—Appellant Santa Cruz County (the County) challenges the trial court's order requiring it to grant plaintiffs' application for a property tax basis transfer. The issue is whether, when a replacement dwelling is constructed on a lot already owned by a person prior to the sale of the person's original property, the value of the lot for "equal or lesser value" purposes under Revenue and Taxation Code section[1] 69.5 is based on the lot's value at the time it was purchased or the lot's value when construction is completed on the replacement dwelling. I write separately to explain why, in my view, the language of the statute and the legislative purpose underlying it require us to conclude that the value of the replacement dwelling for "equal or lesser value" purposes must be determined as of the date when both purchase and construction have been completed.

## I. Facts

The facts are undisputed. Plaintiffs Kenneth Wunderlich and Jeanette Engelhart owned a home (the original property) in Santa Cruz and a lot across the street from the original property. They had purchased the lot in 1979, and, as of 2004, it was assessed at $62,477 for property tax purposes. In January 2004, they sold the original property for $830,000. At that time, the original property was assessed at $187,992 for property tax purposes. Plaintiffs constructed a new home on the lot. The new home was completed within one year after the sale of the original property.

The new property (the lot and the new home built upon it) was assessed for property tax purposes at $730,877. This total included $62,477 for the land and $668,400 for the improvements. When plaintiffs applied for a tax basis transfer, the County determined that the "full cash value" of the new property was $900,000 for purposes of the "equal or lesser value" requirement of section 69.5. The difference between the County's assessment of the new

---

[1] Subsequent statutory references are to the Revenue and Taxation Code.

property for property tax purposes and the County's valuation of the new property for purposes of section 69.5's "equal or lesser value" requirement was due to the fact that the value of the land for tax basis transfer purposes was determined as of the time of completion of the construction of the new home in 2004, while the value of the land for property tax purposes was based on its value when it was purchased in 1979. The land's full cash value in 2004 for tax basis transfer purposes was determined to be $231,600. Because the "full cash value" of the new property ($900,000) exceeded 105 percent of the "full cash value" of the original property at the time of its sale ($871,500), the County deemed plaintiffs ineligible to transfer the tax basis from the original property to the new property.

Plaintiffs filed this action against the County and its assessor.[2] Plaintiffs moved for summary judgment, and the parties stipulated that there were no triable issues of material fact and that the only issue was one of law. The trial court found that the "full cash value" of the new property's lot for tax basis transfer purposes was identical to its assessed value for property tax purposes. The court ordered the County to allow plaintiffs to transfer their tax basis from their original property to the new property. The County appeals.

## II. Discussion

The County contends that, in making the "equal or lesser value" determination that is necessary to qualify a replacement dwelling for a tax basis transfer, the new property, including both the new home and the previously purchased lot, must be valued as of the date of completion of the construction of the new home. Plaintiffs maintain that the lot should be valued for tax basis transfer purposes in the same manner as it is assessed for property tax purpose—that is, based on the lot's value at the time of its purchase in 1979. The parties agree that the resolution of this issue turns entirely on a proper construction of section 69.5.

### A. Standard of Review

"We begin as always 'with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent.' [Citation.] To discover that intent we first look to the words of the statute, giving them their usual and ordinary meaning. [Citations.] 'Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' [Citation.]" (*Trope v. Katz* (1995) 11 Cal.4th 274, 280 [45 Cal.Rptr.2d 241, 902 P.2d 259].) "In construing a statute, we must ascertain the Legislature's

---

[2] Defendants are referred to collectively as the County.

intent in order to carry out the purpose of the law. [Citation.] To do so, we must first examine the language of the statute. [Citation.] If the language is not ambiguous, 'we presume the Legislature meant what it said, and the plain meaning of the statute governs. [Citation.]' [Citation.] However, 'if the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. [Citation.] In the end, we " 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " ' [Citation.] [¶] The interpretation of a statute is a question of law, which we review de novo. [Citation.]" (*State Bd. of Equalization v. Superior Court* (2006) 138 Cal.App.4th 951, 955–956 [42 Cal.Rptr.3d 116].)

## B. Proposition 60 and Section 69.5

Proposition 60 was submitted to the voters by the Legislature and passed by the voters in 1986. It amended article XIII A, section 2, subdivision (a) of the California Constitution to add the following language: "[A]ny person over the age of 55 years who resides in property which is eligible for the homeowner's exemption . . . may transfer the base year value of the property entitled to exemption . . . to any replacement dwelling of equal or lesser value located within the same county and purchased or newly constructed by that person as his or her principal residence within two years of the sale of the original property. . . . For purposes of this section, 'replacement dwelling' means a building, structure, or other shelter constituting a place of abode, whether real property or personal property, and any land on which it may be situated. . . . This paragraph shall apply to any replacement dwelling that was purchased or newly constructed on or after November 5, 1986." (Cal. Const., art. XIII A, § 2, subd. (a).)

Proposition 60 expressly granted authority to the Legislature to delineate the "appropriate circumstances" and the "definitions and procedures" under which a tax basis transfer would be permitted. (Cal. Const., art. XIII A, § 2, subd. (a).) The Legislature promptly utilized this authority to enact section 69.5 in 1987. The Legislature amended a portion of section 69.5 that is material to the issue before us in 1988.

"[A]ny person claiming the property tax relief provided by this section shall be eligible for that relief only if the following conditions are met: [¶] . . . [¶] (5) The original property of the claimant is sold by him or her within two years of the purchase or new construction of the replacement dwelling. For purposes of this paragraph, the purchase or new construction of

the replacement dwelling includes the purchase of that portion of land on which the replacement building, structure, or other shelter constituting a place of abode of the claimant will be situated and that, pursuant to paragraph (3) of subdivision (g), constitutes a part of the replacement dwelling." (§ 69.5, subd. (b)(5).)

"For purposes of [section 69.5]: [¶] . . . [¶] (3) 'Replacement dwelling' means a building, structure, or other shelter constituting a place of abode, whether real property or personal property, that is owned and occupied by a claimant as his or her principal place of residence, and any land owned by the claimant on which the building, structure, or other shelter is situated. . . . [¶] . . . [¶] (5) 'Equal or lesser value' means that the amount of the full cash value of a replacement dwelling does not exceed one of the following: [¶] (A) One hundred percent of the amount of the full cash value of the original property if the replacement dwelling is purchased or newly constructed prior to the date of the sale of the original property. [¶] (B) One hundred and five percent of the amount of the full cash value of the original property if the replacement dwelling is purchased or newly constructed within the first year following the date of the sale of the original property. [¶] (C) One hundred and ten percent of the amount of the full cash value of the original property if the replacement dwelling is purchased or newly constructed within the second year following the date of the sale of the original property. [¶] For the purposes of this paragraph, except as otherwise provided in paragraph (4) of subdivision (h), if the replacement dwelling is, in part, purchased and, in part, newly constructed, the date the 'replacement dwelling is purchased or newly constructed' is the date of purchase or the date of completion of construction, whichever is later. [¶] (6) 'Full cash value of the replacement dwelling' means its full cash value, determined in accordance with Section 110.1, as of the date on which it was purchased or new construction was completed, and after the purchase or the completion of new construction." (§ 69.5, subd. (g).)

"With respect to the transfer of base year value of original properties to replacement dwellings located in the same county, this section, except as provided in paragraph (3) or (4), shall apply to any replacement dwelling that is purchased or newly constructed on or after November 6, 1986." (§ 69.5, subd. (j)(1).)

## C. Legislative History

The ballot pamphlet for Proposition 60 did not explicitly or implicitly address the possibility that a lot might be purchased more than two years before the sale of the original property and a structure built upon that lot to serve as a replacement dwelling within two years of the sale of the original property.

The Legislature exercised its authority under Proposition 60 by enacting Assembly Bill No. 60 (1987–1988 Reg. Sess.), which created section 69.5. (Stats. 1987, ch. 186, § 1, p. 1142.) The Legislative Analyst's analysis of an early version of Assembly Bill No. 60 opined that "[the original] property must be sold *prior to* the purchase or new construction of the replacement property, *and prior to the purchase of land on which a replacement dwelling will be built.*"[3] (Legis. Analyst, analysis of Assem. Bill No. 60 (1987–1988 Reg. Sess.) Apr. 3, 1987, pp. 2–3, italics added.) However, Assembly Bill No. 60 was subsequently amended to allow the replacement dwelling to be purchased before the sale of the original property so long as the purchase occurred within two years of the sale. (Assem. Amend. to Assem. Bill No. 60 (1987–1988 Reg. Sess.) June 1, 1987.)

In 1988, the Legislature enacted Assembly Bill No. 2878 (1987–1988 Reg. Sess.), which amended section 69.5. One of the amendments made by Assembly Bill No. 2878 was the addition of the language in section 69.5, subdivision (g)(5) regarding "the date" to be used "if the replacement dwelling is, in part, purchased and, in part, newly constructed." The purpose of this added language was to "specif[y] the *replacement date* when the replacement dwelling is acquired through acquisition of vacant land and subsequently constructed on the land, *for purposes of determining the permissible value* of the replacement dwelling." (Sen. Com. on Revenue and Taxation, Rep. on Assem. Bill No. 2878 (1987–1988 Reg. Sess.) as amended Aug. 9, 1988, italics added.) This added language was intended to "specif[y] what replacement date should be used if the replacement dwelling is acquired through the acquisition of vacant land and the new construction of a dwelling on the land (*the replacement date determines the permissible value* of the replacement dwelling for qualification for relief)." (Assem. Com. on Revenue and Taxation, Rep. on Assem. Bill No. 2878 (1987–1988 Reg. Sess.) as amended June 6, 1988, italics added; Assem. 3d reading analysis of Assem. Bill No. 2878 (1987–1988 Reg. Sess.) as amended June 28, 1988.)

## D. Analysis

The parties agree that the value of the *original* property was required to be determined as of the time it was sold in 2004. They disagree about how to value the replacement dwelling for purposes of the equal or lesser value determination. The County's position is that the replacement dwelling is a composite of the new home and the lot, and the value of this composite was required to be determined as of the time that the last component, the new home, was completed. Plaintiffs argue that the two components of the

---

[3] I take judicial notice of the legislative history of section 69.5. (Evid. Code, § 452, subd. (c).)

replacement dwelling should be valued as of different dates, with the lot valued as of the time of its original purchase in 1979, and the new home valued as of the time of the completion of its construction in 2004.

The resolution of this dispute turns on the Legislature's intent when it enacted and amended section 69.5. Section 69.5 sets forth three basic requirements that must be satisfied to qualify for a tax basis transfer. A person who is over 55 and owns and resides at the original property must sell the original property. Within two years of that sale (which may be either two years before or two years after), that person must purchase or construct a replacement dwelling. The replacement dwelling must be of equal or lesser value than the original property.

The Legislature went to great pains to clearly identify the "replacement dwelling" as an *integrated composite* of a structure and the land upon which it stands. " '[R]eplacement dwelling' means a building . . . *and any land* on which it may be situated." (Cal. Const., art. XIII A, § 2, subd. (a), italics added; see § 69.5, subd. (g)(3).) Both Proposition 60, which was submitted to the voters by the Legislature, and section 69.5, which was enacted and amended by the Legislature, repeatedly and explicitly refer to the "replacement dwelling" as a *single integrated entity* composed of the land and the structure upon it. Not once do they suggest that a "replacement dwelling" is composed of *separable* components. It is the "replacement dwelling" that must be purchased or constructed within two years of the sale of the original property, and the "replacement dwelling" that must be of "equal or lesser value."

Section 69.5, subdivision[4] (g)(5) contains section 69.5's *definition* of "equal or lesser value." It is here that section 69.5 refers to a "part" of a "replacement dwelling": "[I]f the replacement dwelling is, in part, purchased and, in part, newly constructed, the date the 'replacement dwelling is purchased or newly constructed' is the date of purchase or the date of completion of construction, *whichever is later*."[5] (Subd. (g)(5), italics added.) This provision serves to confirm the Legislature's intent to treat a replacement dwelling as a single unified composite. By explicitly requiring the equal or lesser value determination to be premised on a *single* date for the *entire* replacement dwelling, even where the purchase of one part and the completion of construction of another part occurred on different dates, the Legislature strongly indicated its intent that the determination of whether a replacement dwelling was of equal or lesser value than the original dwelling

---

[4] All subdivision references are to subdivisions of section 69.5.

[5] Subdivision (b)(5) also refers to a "part" of the replacement dwelling, but this reference is made only to reinforce the point that the land is included as "part" of the replacement dwelling.

was to be made based on the *unified whole* rather than on the sum of two separable parts. By mandating the use of the "later" of these two dates, the Legislature reinforced its intent to require the equal or lesser value determination to be based on the value of the fully unified and complete replacement dwelling rather than on the value of two separate components.

Plaintiffs contend that the only significance to "the date the 'replacement dwelling is purchased or newly constructed' " is the selection of the *percentage multiplier* that applies under subdivision (g)(5). They claim that this date has no other role to play in making the equal or lesser value determination. While the final sentence of subdivision (g)(5) may not explicitly preclude such an interpretation when viewed in isolation, the totality of the statutory scheme and all of the relevant indications of the Legislature's intent render such an interpretation unreasonable.

First, the mere fact that the final sentence of subdivision (g)(5) begins "For the purposes of this paragraph," tells us very little because the "paragraph" in question is subdivision (g)(5), the crucial equal or lesser value definition, which contains, but is not limited to, the percentage multiplier determination. The introductory clause of subdivision (g)(5) states the rule that "the amount of the full cash value of a replacement dwelling" may not exceed a specified percentage of the original property's value. This clause treats the replacement dwelling as a single unified entity. The final sentence of subdivision (g)(5) confirms that the equal or lesser value determination must treat the replacement dwelling as a single unified entity (a single date) and that the value of that single unified entity cannot be evaluated until all purchase and construction have been completed (the later date).

Second, the legislative history reflects that the Legislature did not view the final sentence of subdivision (g)(5) in the narrow manner that plaintiffs advocate. When this sentence was added to section 69.5 in 1988, the Legislature indicated that this sentence would "specif[y] what replacement date should be used . . . [to] determine[] the permissible value of the replacement dwelling for qualification for relief." (Assem. Com. on Revenue and Taxation, Rep. on Assem. Bill No. 2878 (1987–1988 Reg. Sess.) as amended June 6, 1988; Assem. 3d reading analysis of Assem. Bill No. 2878 (1987–1988 Reg. Sess.) as amended June 28, 1988.) By referring broadly to the "permissible value" rather than narrowly to the applicable percentage multiplier, the Legislature indicated that the broader interpretation was the one it intended.

Finally, the overriding purpose of the equal or lesser value determination would be subverted if it were not required to be based on the value of the fully completed, unified replacement dwelling rather than component parts evaluated at disparate times. The Legislature (and the voters) plainly intended to permit a tax basis transfer only when an eligible person moved from a more valuable dwelling to a less valuable dwelling. A determination of the current value of the entire completed replacement dwelling serves this purpose. A determination of the value of the replacement dwelling that is based in part on the long-ago value of a component part of the replacement dwelling invalidates the comparison between the original and replacement properties and would permit a person to qualify for a tax basis transfer when he or she moved from a less valuable original property to a more valuable replacement dwelling. The language and history of Proposition 60 and section 69.5 are utterly inconsistent with such an interpretation.

Plaintiffs also argue that subdivision (g)(6)'s reference to section 110.1 means that the lot must be valued based on its 1979 purchase price. Subdivision (g)(6) reads: " 'Full cash value of the replacement dwelling' means its full cash value, *determined in accordance with Section 110.1*, as of the date on which it was purchased or new construction was completed, and after the purchase or the completion of new construction." (Subd. (g)(6), italics added.) This subdivision, like the others, refers to the replacement dwelling as a single unified entity that must be valued "as of *the* date on which *it* was purchased or new construction completed." (Italics added.) This language is inconsistent with an interpretation that requires each *part* of a replacement dwelling to be valued as of a different date. The reference to section 110.1 obviously was intended to incorporate that section's definition of "full cash value" as meaning "fair market value." (§ 110.1, subd. (a).) Nothing in section 110.1's definition of "full cash value," which is the sole import of subdivision (g)(6), requires parts of a dwelling to be separately valued as of different dates.

Plaintiffs argue that it makes no sense for the County to make a different valuation determination for tax basis transfer purposes as opposed to property tax purposes. The rationale is obvious. Property tax assessments are made on an ongoing basis, and they depend on previous assessments. On the other hand, the equal or lesser value determination that is essential to qualify for a tax basis transfer is made a single time when the applicant applies for that transfer. Property tax assessments are simply unrelated to equal or lesser value determinations. Hence, it makes perfect sense that different methodologies would be employed in making these unrelated valuations.

The only reasonable construction of section 69.5 is that it requires the equal or lesser value determination to be based on the value of the replacement dwelling at the time that both the purchase and construction of the component parts of the replacement dwelling are complete. Hence, the trial court erred in ordering the County to permit plaintiffs to transfer their tax basis.

## III. Conclusion

The trial court's order must be reversed. On remand, the trial court should be directed to vacate its order granting plaintiffs' summary judgment motion and enter a new order denying their motion. The County should recover its costs on appeal.

**BAMATTRE-MANOUKIAN, Acting P. J.,** Concurring and Dissenting.— The plaintiff homeowners, Kenneth Wunderlich and Jeanette Engelhart, both over 55 years of age, built a new home that would accommodate Wunderlich's use of a wheelchair due to postpolio syndrome. The new home replaced their original residence, which was located across the street. After selling their original residence for $830,000 and completing construction of their new, wheelchair-friendly house in 2004, the senior homeowners applied for property tax relief under Proposition 60 (Cal. Const., art. XIII A, § 2, subd. (a); Rev. & Tax. Code, § 69.5),[1] which would enable them to transfer the base year value of their original residence, $187,992, to their new home. Having had the foresight to purchase the land for their new home in 1979, they believed that for purposes of Proposition 60 the land portion of their new home would be valued at its 2004 adjusted base year value of $62,477 and therefore their replacement dwelling with a value of $730,877 ($62,477 land plus $668,400 house) would be of equal or lesser value than their original residence.

The homeowners' request for property tax relief under Proposition 60 was denied by the County of Santa Cruz (County), which determined that for purposes of Proposition 60 the value of the land portion of their new home was $231,600, which was the fair market value of the land on the date construction of the new house was completed in 2004. The County separately valued the new house for Proposition 60 purposes at a fair market value of $668,400. Because the County calculated that the total fair market value of the new residence was $900,000 ($231,600 land plus $668,400 house), which was greater than the Proposition 60 limit of $871,500 (105 percent of the $830,000 sale price for the homeowners' original residence, per § 69.5,

---

[1] All statutory references hereafter are to the Revenue and Taxation Code.

subd. (g)(5)(B)), the County denied the homeowners' request to transfer the base year value of their original residence to their new home pursuant to Proposition 60.

The homeowners do not dispute the value that the County assigned to their new wheelchair-friendly house for purposes of Proposition 60. Their disagreement with the County concerns the fair market value of $231,600 that the County assigned to the land portion of their new home. According to the homeowners, the trial court, and two members of California's State Board of Equalization,[2] the County erred because the land should be valued for Proposition 60 purposes at its 2004 adjusted base year value of $62,477, not at fair market value on the date construction of the new house was completed. The homeowners therefore contend that when their new residence is properly valued for purposes of Proposition 60 as $730,877 ($62,477 land plus $668,400 house), which is well under the Proposition 60 limit of $871,500, they are entitled to transfer the base year value of their original residence, $187,992, to their new home.

Based on the circumstances of this case, I agree with my colleagues that the homeowners' entitlement to property tax relief under Proposition 60 turns on the value that is assigned to the land portion of their replacement dwelling for the calculation of whether the replacement dwelling is of "equal or lesser value" than the original residence. (§ 69.5, subd. (a)(1).)

I also agree with my colleagues that when the voters passed Proposition 60 in 1986 they intended to provide tax relief to qualified homeowners over 55 years of age by allowing them to transfer the base year value of their property, as established under Proposition 13, to any replacement dwelling of equal or lesser value within the county. (Cal. Const., art. XIII A, § 2, subd. (a).)

However, I respectfully disagree with my colleagues' conclusion that the trial court erred in granting plaintiff homeowners' motion for summary judgment. The trial court's summary judgment order stated that "the assessed value of $187,992.00 from 520 Stagg Lane shall be carried over to 521 Stagg Lane commencing with the Supplemental Assessment against 521 Stagg Lane dated June 18, 2005." The trial court's ruling was based upon the court's determination that (1) under section 69.5, subdivision (g)(6), "the 'full cash

---

[2] This court granted the motion of State Board of Equalization members Bill Leonard and Michelle Steel to file an amicus curiae brief in support of respondents.

value' of plaintiffs' land for the 'replacement dwelling' is $62,477.00";
(2) "when combined with the $668,400.00 'full cash value' of the improve-
ments for plaintiffs' 'replacement dwelling,' the sum is $730,877.00, which is
less than the $871,500.00 'full cash value' of the 'original property' "; and
(3) "Plaintiffs meet the 'equal or lesser value' test and are entitled to the
benefits of Proposition 60."

While my colleagues have determined that the voters and the Legislature
clearly intended that the land portion of a replacement dwelling be valued for
purposes of Proposition 60 as the fair market value of the land on the date
that construction of the new residence was completed, I believe that Proposi-
tion 60 and the implementing provisions of the Revenue and Taxation Code
are ambiguous with regard to the proper method of valuing the land in the
situation where the land was purchased more than two years before the sale
of the original property and a structure was built upon that land to serve as a
replacement dwelling within two years of the sale of the original property.
My determination is based upon the well-established rules for interpreting tax
statutes.

The California Supreme Court has instructed that "Persons may adopt any
lawful means for the lessening of the burden of taxes which in one form or
another may be laid upon properties or profits. (*Pioneer Express Co. v. Riley*
[(1930)] 208 Cal. 677, 687 [284 P. 663].) It was also reiterated in that case
that courts, in interpreting statutes levying taxes, may not extend their
provisions, by implication, beyond the clear import of the language used, nor
enlarge upon their operation so as to embrace matters not specifically
included. In case of doubt, construction is to favor the taxpayer rather than
the government." (*Edison California Stores, Inc. v. McColgan* (1947) 30
Cal.2d 472, 476 [183 P.2d 16]; see *Agnew v. State Bd. of Equalization* (1999)
21 Cal.4th 310, 327 [87 Cal.Rptr.2d 423, 981 P.2d 52].) Thus, "ambiguity in
a tax statute must be resolved in favor of the taxpayer. [Citations.]" (*Ordlock v.
Franchise Tax Bd.* (2006) 38 Cal.4th 897, 906 [44 Cal.Rptr.3d 212, 135 P.3d
628].)

As Justice Mihara correctly observes, the ballot pamphlet for Proposition
60 did not either "explicitly or implicitly address the possibility that a lot
might be purchased more than two years before the sale of the original
property and a structure built upon that lot to serve as a replacement dwelling
within two years of the sale of the original property." (Conc. opn. of
Mihara, J., *ante*, at p. 703.) The constitutional amendment added by Proposi-
tion 60 is similarly silent. (Cal. Const., art. XIII A, § 2, subd. (a).)[3] I believe

---

[3] In pertinent part, article XIII A, section 2, subdivision (a) of the California Constitution
provides, "However, the Legislature may provide that under appropriate circumstances and
pursuant to definitions and procedures established by the Legislature, any person over the age

that this omission must be "regarded as silence which creates ambiguity." (*Dreyer's Grand Ice Cream, Inc. v. County of Alameda* (1986) 178 Cal.App.3d 1174, 1182 [224 Cal.Rptr. 285].)

Furthermore, the statutes implementing Proposition 60 lend themselves to two reasonable interpretations, as argued by the parties and the amici curiae. My colleagues agree with the interpretation advanced by the County and California's State Board of Equalization,[4] who contend that sections 69.5 and 110.1 together provide that, for purposes of determining whether the replacement dwelling is of equal or lesser value than the original property, the fair market value of the land and the improvements that comprise the replacement dwelling must be determined as a single unit on the date that construction of the replacement dwelling was completed.

The homeowners and two other members of California's State Board of Equalization urge a different interpretation. They argue that sections 69.5 and 110.1 must be construed to provide that the land portion of the replacement dwelling is valued separately as of the date the land was purchased, which is the base year value adjusted under Proposition 13 (Cal. Const, art. XIII A, § 2, subd. (b)). Because there are two reasonable interpretations, the statutory language must be deemed to be ambiguous. (*Ordlock v. Franchise Tax Bd.*, *supra*, 38 Cal.4th at p. 906.)

Consequently, I do not agree with Justice McAdams that "the specific provisions that concern us here are expressed in clear and unambiguous terms." (Lead opn., *ante*, at p. 695.) I also do not agree with Justice Mihara that the "only reasonable construction of section 69.5 is that it requires the equal or lesser value determination to be based on the value of the replacement dwelling at the time that both the purchase and construction of the

---

of 55 years who resides in property which is eligible for the homeowner's exemption under subdivision (k) of Section 3 of Article XIII and any implementing legislation may transfer the base year value of the property entitled to exemption, with the adjustments authorized by subdivision (b), to any replacement dwelling of equal or lesser value located within the same county and purchased or newly constructed by that person as his or her principal residence within two years of the sale of the original property. For purposes of this section, 'any person over the age of 55 years' includes a married couple one member of which is over the age of 55 years. For purposes of this section, 'replacement dwelling' means a building, structure, or other shelter constituting a place of abode, whether real property or personal property, and any land on which it may be situated. For purposes of this section, a two-dwelling unit shall be considered as two separate single-family dwellings. This paragraph shall apply to any replacement dwelling that was purchased or newly constructed on or after November 5, 1986."

[4] This court granted the application of California's State Board of Equalization to file an amicus curiae brief in support of the appellants.

component parts of the replacement dwelling are complete." (Conc. opn. of Mihara, J., *ante*, at p. 708.)

Further, I cannot agree with my colleagues' view that the Legislature clearly intended to prohibit the use of the adjusted base year value of the land portion of the replacement dwelling for purposes of Proposition 60 where the land was purchased more than two years before the sale of the original property. To the contrary, both Proposition 60 and its implementing statutes, as well as the Proposition 60 ballot pamphlet and the legislative history, suggest that the voters and the Legislature did not contemplate the method to be used for valuing the land portion of a replacement dwelling for purposes of Proposition 60 where, as here, the homeowners purchased the land for their replacement dwelling many years before the replacement dwelling was constructed.

Finally, I believe that it is important to keep in mind that the ballot pamphlet for Proposition 60 informed the voters that Proposition 60 was intended to provide property tax relief to seniors. The argument in favor of Proposition 60 stated that "California can create new housing opportunities for senior citizens by easing a property tax burden that now prevents many of them from finding affordable housing. [¶] . . . [¶] The solution is to let seniors who want to sell their homes take their current property tax assessment to their new place of residence. [¶] If approved by the voters, Proposition 60 would do just that by amending the State Constitution to authorize the Legislature to provide that the base year value of owner-occupied residential property can be transferred for seniors to newly purchased or constructed owner-occupied residential property of equal or lesser value." (Ballot Pamp., Gen. Elec. (Nov. 4, 1986) argument in favor of Prop. 60, p. 34.) The rebuttal to the argument against Proposition 60 further stated, "By voting for Proposition 60 we can help give senior citizens freedom to live where they choose in their county area. [¶] Please remember that Proposition 60 stands for fairness." (*Id.*, rebuttal to argument against Prop. 60, p. 35.)

I believe that fairness under Proposition 60 is best achieved, in the case before us, by affirming the trial court's order granting the homeowners' motion for summary judgment. The ambiguity in the constitutional and statutory language that I have discussed above, regarding the proper method for valuing the land portion of a senior's replacement dwelling for purposes of Proposition 60, should be construed in the taxpayers' favor to allow Proposition 60 tax relief to these homeowners, who reasonably believed that the land portion of their replacement dwelling would be valued at the 2004 adjusted base year value of $62,477 and therefore their replacement dwelling qualified for property tax relief under Proposition 60.

Due to the importance of this issue to the taxpayers of this state, and, in particular, to our senior citizens who, like the homeowners here, wish to purchase or construct replacement dwellings to which they may transfer the base year value of their original residence, I respectfully invite the Legislature to enact legislation clarifying the proper method for valuing the land portion of a replacement dwelling for purposes of Proposition 60 where the land was purchased more than two years before the sale of the original property and a structure was built upon that land to serve as a replacement dwelling within two years of the sale of the original property.